E. P. GREENWOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDNA M. GREENWOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 81484, 81485.    Promulgated October 23, 1936.

*Wright Matthews*, Esq., and *A. M. Cameron*, C. P. A., for the petitioners.

*B. M. Coon*, Esq., for the respondent.

### OPINION.

LEECH: These proceedings, consolidated for hearing and decision, seek redetermination of deficiencies of $6,738.91 in income tax proposed against each of the petitioners for the calendar year 1932. Petitioners are husband and wife, and the income in question is from community property. Separate returns were filed for the taxable year. The issues in each case are identical.

The stipulation of most of the facts was supplemented by certain evidence, principally upon the question of fair market value, if any, of contracts received by petitioner, E. P. Greenwood, during the tax year, for the purchase of stock.

The facts, briefly stated, follow:

The petitioners, throughout the tax year, were husband and wife, and the income which gives rise to the pending controversy is derived from community property. The petitioners were on a cash basis.

The petitioner, E. P. Greenwood, is the president of the Great Southern Life Insurance Co. of Houston, Texas, and maintains his residence and place of business at Dallas, Texas.

In the tax year, 1932, he was the owner of more than 200,000 shares of a total of 300,000 issued shares of stock of the Great Southern Life Insurance Co. Additional stock in that company, owned by his family and close business associates, together with his stock, constituted 90 percent of the total issued stock of that company.

At the time of the transactions involved here, the stock of Great Southern Life Insurance Co. had a market value of about $50 per share. The par value of this stock was $10 per share, and that owned by the petitioner, E. P. Greenwood, had a cost to him of much less than its market value. At or about the beginning of 1932, this petitioner decided to sell from 5,000 to 25,000 shares of his stock, for the purpose of realizing a profit therefrom, and to secure a distribution of such stock in the territory in which the company did the larger part of its business.

This petitioner employed a stockbroker, E. J. Silvers, to dispose of such stock. Under that contract of employment, Silvers was to employ the salesmen. The stock was to be sold for $50 per share and Silvers was to receive a commission of $10 on each share of stock sold. All sales were to be made on one of two plans. One of these plans provided that 40 percent of the consideration should be paid in cash and the balance in equal payments, at the end of the first and second years, with interest at 6 percent. The other plan provided that 10 percent of the consideration should be paid in cash and the balance in 24 equal monthly installments, with interest at 6 percent.

These printed contracts, covering both these plans, identical, except as stated, describe the petitioner, E. P. Greenwood, as the seller, and obligate the buyer therein to purchase the specified number of shares at $50 per share. The contracts provided also that the ownership of the stock should not pass nor be transferred upon the books of the company until full payment therefor had been made. They contained the further provision that, pending such full payment, all dividends declared upon the stock should be retained by petitioner, E. P. Greenwood, and that all regular and special cash dividends should be applied by him, first, to interest and, second, to the principal of the amounts owing under the contract. All of the stock dividends declared were to be delivered to the purchaser, together with the purchased shares, upon the full performance of the contract.

Silvers employed salesmen who entered upon the sale of the stock. As many as 14 men were engaged at one time in that work. Silvers' commission of $10 per share was paid out of the initial cash payment in each sale. The records covering the transactions with each purchaser were kept in the office of petitioner, E. P. Greenwood. He answered, personally, all correspondence from prospective purchasers, and attended to all complaints and adjustments on the purchase contracts.

During the year 1932 there were 283 sales made, totaling 43,062 shares of stock. Five hundred forty-nine of these shares were sold for cash and the balance were sold under either one or the other of the two forms of installment contracts. The sale of 237 shares was canceled after 1932.

Dividends were declared by the Great Southern Life Insurance Co. in a stipulated amount upon certain of the stock, under certain of the contracts. These dividends were received by that petitioner and credited to the accounts of the purchasers of the stock under those respective contracts, as payments of interest due or to become due in the future on those contracts.

The principal issue raised by the assignments of error is whether, in thus selling this stock, the petitioner was "a person who regularly sells or otherwise disposes of personal property on the installment plan." Revenue Act of 1932, sec. 44 (a).[1]

The petitioner was not engaged in the regular business of buying and selling stock. His regular business was that of an insurance company executive. He owned stock in that company, a part of which he desired to sell. In its sale, he adopted the installment basis. Numerous sales under that plan, consuming a comparatively considerable period of time, occurred in disposition of that stock. In those circumstances, were petitioners within the purview of section 44 (a), *supra?*

Petitioners cite *Marshall Brothers Lumber Co.*, 13 B. T. A. 1111. In that case the petitioner was obviously in, the business of buying and selling building materials. The only inquiry was whether, upon that premise, the fact that its sales for cash were much more numerous than those on the installment plan contradicted the regularity of its use of the installment plan and thus defeated its right to the statutory installment computation of income. Here, however, the consistency in the use of the installment plan in the sales that were

---

[1] SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

made is undoubted. The mechanics of the admitted transactions are not in issue. But, the question presented is merely whether the petitioners regularly sold or otherwise disposed of stock so as to entitle them to the benefits of the quoted statutory provision.

The sale of petitioner's stock was in no way connected with his business as an executive. It would be completed upon the disposition of the stock to be sold. The actual sale of these shares of stock was accomplished by many transactions, but neither that fact, nor the length of time such transactions consumed, characterizes them as having been made by "a person who regularly sells or otherwise disposes of personal property on the installment plan" or any other plan. Such transactions were casual sales. A business which is limited to the disposition of certain specific property of an individual is not a business regularly carried on under section 44 (a), *supra*.

This identical question was considered by the Board in *50 East 75th Street Corporation*, 29 B. T. A. 277. The petitioner there sold stock in an apartment house. Sales were limited to that one stock and were made on the installment basis. In denying the benefits of section 212 (d) of the Revenue Act of 1926, which included the same provision here involved, as limited to dealers in personal property, the Board said:

There is no evidence that petitioner ever engaged in any other project similar to the one described in the findings, and so the question must be decided entirely on the facts as they are shown in connection with the sale of stock of the one corporation. The statute limits the use of the installment basis to those persons who "regularly" sell "on the installment plan." The statute does not define the term "regularly", but the respondent's regulations have consistently employed the phrase "dealers in personal property" as descriptive of the class to whom the installment provisions apply. We strongly doubt whether the acquisition and sale of one lot of personal property can properly constitute one a dealer in such property. The term rather applies to those who engage continuously in such an activity. * * *

In affirming the case on the pending issue, *50 East 75th Street Corporation* v *Commissioner*, 78 Fed. (2d) 158, the Circuit Court of Appeals for the Second Circuit said:

We think the Commissioner was right in not regarding the taxpayer as "a person who regularly sells or otherwise disposes of personal property on the installment plan." The first provision of section 212 (d) was perhaps intended primarily to relieve persons engaged in selling furniture or other chattels on the installment plan from paying a profit tax on the entire transaction at the outset, when, owing to the failure of the purchasers to meet all their payments, nothing like the expected profit might ever be realized. While we do not suggest that the provisions will only mitigate the sorrows of persons engaged in selling chattels on the installment plan, it seems clear that it was not intended to include the disposition of a single block of stock sold in order to close out one enterprise, but rather contemplated a business that was to con-

tinue for a substantial period of time and to involve numerous transactions. It certainly did not relate to a corporation marketing a single block of stock and then going out of business.

We conclude that the petitioner was not regularly carrying on a business of selling stock on the installment plan within the provision of section 44 (a) of the Revenue Act of 1932, *supra*, even though his sales may have been on the installment basis. Accordingly, the Commissioner was correct in computing the profit of petitioner on the installment basis only as to those sales for prices exceeding $1,000 each, as provided by section 44 (b) of that Revenue Act.[2]

Petitioners contend, secondly, that even if such sales were casual and, therefore, within the provisions of section 44 (b), *supra*, the expenses paid in the tax year in connection with those sales of stock which fell within the provisions of section 44 (b), *supra*, permitting the return upon the installment basis of profit therefrom, should be allowed as deductions from gross income for the year in which paid.

This position is without merit. These expenses were the commissions paid the broker for securing the contracts of sale. They amounted to $10 per share and were paid by Greenwood. He was not required to return the income from these sales on the installment basis. The law merely gave him the option of so doing. If he elects to so return the income, he assumes the consequences of that method of computation unless his taxable income was not thus properly reflected—a situation that does not exist here. *Charles J. Derbes*, 24 B. T. A. 276; affd., 69 Fed. (2d) 788; *Johnson Realty Trust*, 21 B. T. A. 1333. The installment method of computation requires that the total gain be computed and returned over the period of payment, in proportion to the cash payments actually received in the several years.

Under this plan, proper expenses of sale are deducted from the gross selling price in order to reach the correct amount of gain from the sale. To permit petitioners, after that computation, to deduct from gross income the commission paid, would be to allow a double deduction. On the other hand, a failure to reflect the amount of the commission in the computation of the net gain from the transaction, would result in a failure to compute the actual gain.

---

[2] SEC. 44. INSTALLMENT BASIS.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 40 per centum of the selling price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

In his determination of the profit arising on petitioners' stock sales, upon which the present deficiency is predicated, the respondent treated the contracts received for the purchase of such stock as of a fair market value equal to the face value.

Petitioners' position here is that those contracts had no fair market value when received. We agree. The contracts were not obligations to pay for property purchased and delivered. They were only agreements to buy. They evidenced an obligation with petitioner Greenwood, personally, and his obligation thereunder could not be assigned without the agreement of the purchaser of the stock. Upon the uncontradicted testimony in the record, as well as the contracts themselves, we find that such contracts had no fair market value when received by petitioners. Their value was limited to the payments made thereon. Consequently, petitioners are entitled to recover their cost and proper expenses before being charged with taxable gain. *Burnet* v. *Logan*, 283 U. S. 404; *J. Darsie Lloyd*, 33 B. T. A. 903; *C. W. Titus, Inc.*, 33 B. T. A. 928.

In determining the present deficiencies, respondent treated all the cash dividends mentioned in the findings of fact as interest received and, therefore, income of the petitioners for the calendar year. Petitioners now question this action.

At the time Greenwood received these disputed dividends, the unpaid principal accounts of each purchaser, plus interest then due thereon, exceeded such respective dividend payments. By reason of that fact, under the contract, these dividends were gross income to Greenwood when received by him. *Corliss* v. *Bowers*, 281 U. S. 376; *Eisner* v. *Macomber*, 252 U. S. 189.

However, were those dividends received by Greenwood as interest and therefore taxable in their entirety as such when received, under the statute (Revenue Act of 1932, sec. 22 (a)), or were such dividends received by Greenwood as a payment on account of the principal due on the stock purchased and thus taxable on only so much as constituted income for the year of their receipt? The only evidence on this question in the record is the written contracts, by virtue of the provisions of which, alone, Greenwood retained these dividends. The natural construction of the provision of those contracts, having to do with these dividends, is that they should be applied first in payment of interest due in the tax year from the respective stock purchasers, and any balance against the respective principal accounts then unpaid. True, Greenwood, by his bookkeeping entries, may not have treated them as payments of principal. But, under the controlling contract and the facts as they existed upon the receipt of those dividends by Greenwood, they were received by him as interest payments only, in the amounts then due from the respective pur-

chasers as interest. The balance of such dividends were received by him as payments on account of principal. The contradicting book entries made by Greenwood do not. change that fact. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179.

Petitioners attack respondent's disallowance of certain incidental expenses incurred by petitioner Greenwood in connection with the disputed sales of his stock.

The necessary premise of petitioners' position is that they were deductible as ordinary and necessary expenses of carrying on a trade or business. Revenue Act of 1932, sec. 23 (a).

Since we have already held herein that the disputed sales of petitioner Greenwood's stock were casual, it follows such sales did not constitute a trade or business within the cited statutory provision. *Mente* v. *Eisner*, 266 Fed. 161; *Bedell* v. *Commissioner*, 30 Fed. (2d) 622; *Washburn* v. *Commissioner*, 51 Fed. (2d) 949. Accordingly, petitioners are denied this deduction.

*Judgment will be entered under Rule 50.*