Eleanor M. Willhoit v. Commissioner. John D. Willhoit v. Commissioner.
Willhoit v. Commissioner
Docket Nos. 32413, 32414.
United States Tax Court
T.C. Memo 1958-207; 1958 Tax Ct. Memo LEXIS 16; 17 T.C.M. (CCH) 1024; T.C.M. (RIA) 58207; December 10, 1958
Emmett E. Doherty, Esq., 848 General Petroleum Building, Los Angeles, Calif., and Granville B. Smith, Esq., for the petitioners. George E. Constable, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in income tax and additions to tax as follows: Addition to tax
Docket
Sec. 293(b)
Petitioner
No.
Year
Deficiency
I.R.C. 1939
Eleanor M. Willhoit
32413
1943
$19,096.79
1944
22,252.35
1945
26,604.11
John D. Willhoit
32414
1941
4,687.04
$ 2,343.52
1942
14,926.88
7,463.44
1943
15,365.07
9,182.17
1944
22,252.35
11,126.18
1945
26,604.11
13,302.06
Issues presented for determination by the pleadings *17 are the correctness of the respondent's action (1) in determining the taxable income of petitioner Eleanor M. Willhoit for the years 1943 through 1945 and of petitioner John D. Willhoit for the years 1941 through 1945 from certain properties and operations involving real estate, (2) in not determining that the periods of limitations for the assessment of deficiencies determined against each petitioner have expired, and (3) in determining that for the years 1941 through 1945 petitionr John D. Willhoit was liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939 because of fraud. At the trial the respondent conceded error as to issue No. (3). With respect to issue No. (2) the respondent concedes error as to the years 1941 and 1942. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners are husband and wife with their residence in Long Beach, California. They timely filed their separate individual income tax returns prepared from books kept on the cash basis for the years in question with the collector for the sixth district of California. All income for the years 1941 through 1945 resulted from the efforts *18 of petitioner John D. Willhoit, sometimes hereinafter referred to as the petitioner. Under the community property laws of California, one-half of such income is taxable to each of the petitioners. The returns of the petitioners and the notices of deficiency were prepared on that basis. The notice of deficiency mailed to Eleanor M. Willhoit contains adjustments to income for 1942 through 1945 which are identical with the adjustments for those years in the notice of deficiency mailed to John D. Willhoit. In 1920, while living in Fresno, California, the petitioner obtained a real estate license. Thereafter, in Fresno and subsequently in Long Beach to which he moved in 1923, he engaged in business as a real estate salesman. In 1934 he obtained a license as a security salesman and thereafter and during 1938 his business was that of real estate salesman and security salesman. Along with his real estate work he obtained loans for individuals from and sold real estate paper to the Long Beach Federal Savings and Loan Association, Long Beach, California, sometimes hereinafter referred to as the Association. Prior to November 1938, E. N. Frame had been engaged in the construction of a number *19 of houses in Long Beach, California. In response to a newspaper advertisement the petitioner met Frame for the first time in November 1938. Frame desired to obtain financing for a subdivision of 28 small dwelling houses which he wished to construct in Lynwood, California. The petitioner introduced Frame to Thomas A. Gregory, president of the Association, and arrangements were made whereby the Association advanced funds by means of 28 loans made in November and December 1938 which were used in the construction of 28 houses on the subdivision which was designated as tract No. 11689. Following their completion the houses were sold to house purchasers. The foregoing was the first transaction between Frame and the Association and was the first of a series of transactions engaged in by the Association in which Frame was one of the principal parties and in which the Association made approximately 1,200 loans. An August 25, 1939, Frame owned 22 interest-bearing notes, payable in monthly installments, signed by purchasers of houses in the above-mentioned tract No. 11689, payable to M. Roberto, an associate of Frame in the development of the tract, and secured by second deeds of trust on *20 22 of the lots and houses in the tract. Principal in the total amount of $10,383.46 remained to be paid by the purchasers on the notes. On that date Frame sold the notes and second deeds of trust to petitioner for $5,000. The purchase price was paid from the proceeds of a loan of $6,000 which the petitioner obtained at that time from the Association as loan 138 C. Petitioner assigned the notes and second deeds of trust to the Association to secure the loan. The loan to the petitioner was paid in full to the Association during January 1942. From January 1, 1939, until January 27, 1941, Frame and the petitioner associated together with various individual investors to build houses in seven consecutive tract subdivisions. For each tract they located several investors who supplied funds to buy land and subdivide it into lots. Each investor acquired title to the lots in proportion to his investment. For the seven tracts three similar methods of financing were used. Under the first method of financing, which was used from January 1939 until July 8, 1940, houses were built in five consecutive tracts numbered 11090, 11342, 11858, 12050 and 12216. After the investors acquired title to the *21 lots the Association granted construction loans to them for which they executed notes to the Association due in periodic payments. The investors also executed deeds of trust for the lots to the Association to secure the loans. In addition, the investors executed grant deeds for the lots to Frame which were subject to the deeds of trust to the Association. The construction loans were then used to build houses on the lots. Frame sold the property (houses and lots) to house purchasers on conditional sale contracts. A typical conditional sale contract provided, among other things, for a selling price of $2,450, with a down payment of $50 and monthly payments of $24 each comprising payments of principal and interest, the latter to be at the rate of 6 1/2 per cent per annum. When 25 per cent of the selling price had been paid by the purchaser, he was to receive a deed for the property subject to encumbrances for the unpaid portion of the selling price and interest thereon until paid and other encumbrances on the property arising subsequent to the date of sale. After obtaining the conditional sale contracts Frame assigned them to the Association as additional security for the loans it had *22 made. Under the second method of financing, houses were built on tract No. 12256 beginning on or about July 8, 1940. After the investors acquired title to the lots the Association granted construction loan 147 C to petitioner who executed his note to the Association due in periodic payments. The investors executed notes and deeds of trust to Frame who assigned them to the Association to secure the loan to the petitioner. As in the case of the previous five tracts, the investors executed grant deeds to Frame. The construction loan was used to build houses on the lots and Frame sold them to house purchasers on conditional sale contracts similar to those mentioned above. After obtaining the conditional sale contracts, Frame assigned them to the Association as additional security for the loan it had made to the petitioner. The financing of the construction of the houses built on tract No. 12256 was made in the form of a loan to the petitioner because Gregory, president of the Association, desired to have petitioner primarily liable for the loan since he had found from experience that the petitioner was a better business manager and was more energetic in making collections from property *23 purchasers than Frame. Under the third method of financing, houses were built on tract No. 12343 beginning on or about September 19, 1940. After the investors acquired title to the lots the Association granted construction loan 151 C to the petitioner who executed his note to the Association due in periodic payments. The investors executed notes and deeds of trust to petitioner who assigned them to the Association to secure the loan. As in the case of the previous six tracts the investors executed grant deeds to Frame. The construction loan was used to build houses on the lots and Frame sold them to home purchasers on conditional sale contracts similar to those heretofore mentioned. After obtaining the conditional sale contracts Frame assigned them to the Association as additional security for the loan it had made to the petitioner. In making construction loans with respect to the above-mentioned seven tracts, the Association limited the amount of the loans to an amount not to exceed 75 per cent of the value at which it appraised the land and the improvements to be made thereon. Beginning in 1939 and continuing until the end of 1940, the petitioner at intervals advanced to Frame *24 portions of the additional capital required to complete the improvements made during that period. At the time each construction loan was made with respect to the seven tracts the Association withheld a percentage of the loan proceeds and deposited it in an account with it in the name of Frame. These accounts, sometimes hereinafter referred to as impounded accounts, were pledged to the Association as additional security for the construction loans. Agreements containing similar terms were entered into between Frame and the Association respecting each of the seven tracts at the time the loans were made by the Association for financing construction on the respective tracts. By these agreements Frame assigned to the Association his interest in all conditional sale contracts as mentioned above. Each agreement subsequent to the first had a cumulative effect as a result of the incorporation therein of provisions of all prior agreements pertaining to previous tracts. By reason of this the conditional sale contracts relating to any one tract except the last, tract No. 12343, were assigned as security for subsequent construction loans. By the agreements Frame agreed to correct construction *25 defects in each tract until such time as 75 per cent of the construction loan for that tract had been repaid. The agreements authorized and directed the Association to receive all payments made by home purchasers under the conditional sale contracts. As its compensation for collecting such payments the Association was authorized to deduct 25 cents from each payment. The agreements further provided that the Association should deduct from the amounts collected by it the regular monthly installments due on all the Association's loans currently or theretofore made with respect to the several tracts. The Association was required to pay to Frame or his assignee the excess of any monthly collections from house purchasers over the monthly installments due to the Association on loans. Under the agreements the Association collected and recorded payments made by house purchasers under the conditional sale contracts. The collections were credited by the Association to an account designated "Unapplied Mortgage Credits Account," sometimes hereinafter referred to as the U.M.C. account, which the Association maintained on its books. Within this account the collections were applied to the principal *26 or interest due on all loans theretofore made with respect to the several tracts. Frame used the down payments he received from house purchasers and the sums he received from the Association as the excess of its monthly collections from home owners over the monthly installments due on loans with respect to the several tracts to repay the investors in the various tracts their capital investments and to pay them their profits. The petitioner did not sign the agreements executed by Frame with respect to the first six tracts. However, petitioner, at the request of the Association and as a guarantor, joined Frame in signing and entering into the agreement with the Association of September 19, 1940, relating to tract No. 12343 with respect to which loan 151 C was made by the Association. By so entering into and signing the foregoing agreement the petitioner became obligated with Frame, among other things, to correct construction defects and repair or recondition the buildings before or after sale not only with respect to tract No. 12343 but also with respect to tract Nos. 11090, 11342, 11858, 11890, 12050, 12216 and 12256. In the fall of 1940 and again in the early part of January 1941, *27 heavy rains caused flooded conditions on tract No. 12216 as a result of the failure of about 65 cesspools to handle the rain water. This caused many purchasers of houses in the tract to move out of the houses and abandon their contracts and caused considerable anxiety on the part of other house purchasers. At the time of each of the heavy rains Frame was in Mexico where he had gone without informing anyone as to his whereabouts. In such situations the Association requested petitioner to perform his obligations as guarantor to remedy construction defects in the cesspools and to recondition certain of the houses. Pursuant to the Association's request the petitioner rebuilt the cesspools and cleaned and repainted certain of the houses. The petitioner paid all of the expenses of the foregoing rebuilding and reconditioning, using in part funds of his own and in part a loan of $10,000 which he obtained in December 1940 from the Title Service Company. Although he had assigned to the Association the conditional sale contracts relating to the flooded properties and had entered into an agreement with the Association whereby it issued payment books to the house purchasers and alone was to enter *28 credits therein for payments made by the purchasers, Frame at Christmas time 1940, and after his return to Long Beach following the flooded conditions in the fall of that year, went to a considerable number of house purchasers and, without conferring with or informing the Association and/or receiving any payments whatever, entered a credit of $200 in their respective payment books. Frame's action caused considerable friction to develop between the Association and those purchasers in whose payment books Frame had entered credits of $200 and also those purchasers who had learned of Frame's action but in whose payment books he had not entered any credits. A period of approximately a year was required for the Association to convince the purchasers that Frame's action was ineffective to reduce the amounts owing by them under their contracts. Although Frame and those associated with him were quite successful in getting houses erected and getting them sold, there were other times in addition to those mentioned above when Frame by reason of his absences abroad was not available either to the Association or to purchasers of the houses to take care of matters relating to properties in the *29 various tracts which required his immediate attention. In view of the foregoing, in view of Frame's action at Christmas time 1940 with respect to entering credits in the house purchasers' payment books, and as approximately 50 per cent of the house purchasers were delinquent in their payments under the conditional sale contracts, Gregory became concerned about that portion of the Association's affairs in which Frame was involved. Having found from experience that petitioner was more reliable than Frame and in most respects was more competent than Frame to handle the matters then pending between Frame and the Association and desiring to effect a termination of Frame's relationship to such matters, Gregory, during the latter part of December 1940 and the early part of January 1941, discussed with the petitioner the matter of petitioner purchasing Frame's interests in and relating to the seven tracts. After considering the matter petitioner informed Gregory of his willingness to purchase Frame's interests in the tracts and that as consideration in payment therefor (1) he would cancel all indebtedness owing to him by Frame if Frame would cancel all indebtedness owing by him to Frame, with *30 the result to be that petitioner would cancel an indebtedness of an amount greater than or in excess of the amount to be canceled by Frame, and (2) he would pay Frame $150,000, provided the Association would lend him the $150,000 to pay Frame. Being unwilling to commit the Association to furnish such a sum for such purpose, Gregory asked petitioner if he, Gregory, through his efforts on behalf of the Association, could obtain Frame's acceptance of a smaller sum and the Association would furnish the smaller sum to pay Frame, the petitioner would pay the Association the amount of the difference between $150,000 and the smaller sum, the amount of such difference to be payable only after repayment of a loan of the smaller sum and subject to the current payments required to be made to the Association on the construction loans it had made with respect to the seven tracts. The petitioner agreed to Gregory's proposal. Thereafter, through Gregory's negotiations with Frame, the latter on January 27, 1941, agreed to accept as payment for his interests in the seven tracts, (1) the petitioner's cancellation of Frame's indebtedness to the petitioner with Frame to cancel petitioner's indebtedness *31 to him, and (2) an amount of $110,000 which was to be paid as follows: (1) $49,123.14 to be paid directly to Frame, (2) by assignment to Frame of 18 notes and deeds of trust with a total balance owing thereon of $50,376.86 then owned by the Association and which included certain notes and deeds of trust relating to the seven tracts on which notes there was a total unpaid balance of $11,817.70, and (3) $10,000 to be paid to Title Service Company in repayment of its loan of that amount to petitioner in December 1940, which petitioner had used in rebuilding cesspools and in cleaning and repainting houses. On and effective as of January 27, 1941, the petitioner purchased Frame's interests on the immediately foregoing terms. At the time of the petitioner's purchase of Frame's interests in and with respect to the seven tracts, the interests acquired by petitioner by such purchase consisted of (1) Frame's interest as owner of grant deeds to approximately 800 lots and the improvements thereon subject to the deeds of trust on such lots and improvements then held by the Association as security for the repayment of construction loans, (2) Frame's interest in approximately 800 conditional sale *32 contracts involving such lots and improvements which also had been assigned to the Association as security for the repayment of construction loans, and (3) Frame's interest in the impounded accounts with the Association standing in his name which also had been pledged to the Association as additional security for the repayment of construction loans. At the time the petitioner purchased Frame's interests the home purchasers owed $1,799,602.47 of principal on their approximately 800 conditional sale contracts, and the unpaid balance owing to the Association on notes for construction loans was $1,297,861.10. At that time the total credit balance in the impounded accounts standing in Frame's name was $47,994.12. The houses on the various tracts were constructed to sell and were sold to persons with low incomes on terms of payment which were but slightly different from rental terms. Prior to January 27, 1941, a number of properties in the various tracts had been repossessed because of default in payments by the purchasers. Of the 800 properties involved in the petitioner's purchase of Frame's interests, the purchasers of approximately one-half of the properties were delinquent with *33 respect to one or more of their payments on January 27, 1941, and subsequent to that date the petitioner took possession of a considerable number of the properties because of default in payments by the purchasers. Due to the large number of properties, deeds of trust and conditional sale contracts involved, and to divorces of certain husbands and wives who were parties to certain of the foregoing instruments and due to other matters, a period of several months elapsed before completion of the transfer of Frame's interests to the petitioner and the execution of all the instruments relating to the transaction. To finance the petitioner's purchase of Frame's interests the Association by loan designated No. 8334 loaned petitioner $110,000 on his note for that amount, payable $1,000 per month, secured by second deeds of trust given by the petitioner on the above-mentioned 800 properties involved in the purchase. The second deeds of trust were subject to the first deeds of trust then held by the Association as security for the construction loans made by it. Pursuant to the terms of purchase the above-mentioned $110,000 was paid as follows: (1) $49,123.14 was paid directly to Frame, (2) *34 $50,376.86 was given to the Association for 18 notes and deeds of trust with a total balance owing thereon of $50,376.86 which were assigned to Frame, and (3) the remaining $10,000 was paid to Title Service Company in repayment of its loan to petitioner of that amount in December 1940 and which had been used by petitioner in rebuilding cesspools and cleaning and repainting houses. By reason of his agreement with Gregory to pay the Association the difference between $150,000 and such smaller sum as Gregory might obtain Frame's acceptance of toward payment for Frame's interests and the Association's loaning him the sum required to make such payment and by reason of Frame's acceptance of $110,000, the petitioner became obligated to pay the Association $40,000, hereinafter referred to as commission, in addition to the loan of $110,000 heretofore mentioned. In connection with his obligation as to the payment of the $40,000 and the loan of $110,000, the petitioner on March 21, 1941, and April 9, 1941, executed instruments whereby he assigned to the Association the sum of $40,000 to be paid by him from and out of the net proceeds of the conditional sale contracts and other properties acquired *35 by him from Frame, when and as such sums should be received by him, subject to the conditions: (1) that such assignment was subject to a prior pledge of such properties and contracts to the Association, and (2) that the Association's loan of $110,000 should first be paid in full. Thereupon there was owing to the Association with respect to transactions relating to loan No. 8334 an amount of $1,447,861.10 composed of the following: Loan No. 8334 to petitioner
$ 110,000.00
Commission relative to loan
No. 8334
40,000.00
Unpaid balance of notes for
construction loans secured
by deeds of trust
1,297,861.10
$1,447,861.10
In addition to incurring liability to the Association for the loan of $110,000 and the commission of $40,000, the petitioner in the acquisition of Frame's interests canceled indebtedness owing to him by Frame in the amount of $5,000 in excess of the amount of the indebtedness owing by him to Frame which Frame canceled. On January 30, 1941, the Association owned 66 notes on which principal in the amount of $128,840.24 was due from house purchasers, payable at the rate of $1,352.50 per month. Practically all the notes bore interest at the rate *36 of 6 1/2 per cent per annum or higher and all of the notes were secured by deeds of trust given by the house purchasers. The makers of the notes were delinquent in their payments and collection of the monthly payments due on the notes had become a problem to the Association. In this situation and since the petitioner had built up an efficient organization for selling real estate and for the handling of delinquent borrowers, the Association on January 30, 1941, sold the 66 notes to petitioner for $128,840.24. In payment therefor the petitioner gave the Association his note for a like amount, payable at the rate of $1,050 per month, bearing interest at the rate of 6 per cent per annum and designated by the Association as loan 160 C to petitioner. On the same day the Association assigned the 66 notes and deeds of trust to petitioner and he in turn assigned them back to the Association as security for his note to it. On March 21, 1941, the Association made construction loans of $2,000 each to Cecil L. Crabb for 139 houses to be built on tract No. 9681. Thereafter, on April 1, 1941, the petitioner executed his note for $280,000 to the Association to secure payment of the construction *37 loans. The amount of the note was subsequently reduced to $278,000. These transactions were designated by the Association as loan 168 C to petitioner. Crabb executed notes and deeds of trust to the lots to petitioner who assigned them to the Association as security for his note. The petitioner expended the following amounts for the lots and the construction of 139 houses thereon: Proceeds of loan 168 C
$278,000
Petitioner's personal funds
82,844
Total
$360,844
Immediately after completion all of the houses were sold on conditional sale contracts similar to those heretofore mentioned under which the purchasers' payments were $50 down and $24 a month. Petitioner received no notes, mortgages or other evidences of indebtedness, aside from the conditional sale contracts. The total of the selling prices stated in the sale contracts was $383,400. The contracts were assigned to the Association as additional security for repayment of the construction loans. In December 1939, the Association made construction loans on 143 lots in tract No. 12075 owned by C. S. Jones and his associates who executed notes and deeds of trust to the Association as security for the loans. *38 Jones and his associates built houses on the lots and sold them to house purchasers on conditional sale contracts which were assigned to the Association as additional security for the loans. During the summer and fall of 1940 these loans became a matter of concern to the Association because of the substantial number of delinquencies in monthly payments due from house purchasers. The Association's concern continued to increase because of a considerable number of additional delinquencies until June 1941 when, in addition to the existence of a great number of delinquencies, the 1940 and 1941 city and county taxes on the properties were unpaid and many purchasers of houses had ceased making any payments whatever with respect to their conditional sale contracts. For a period prior to June 1941 the Association conducted negotiations between Jones and his associates and the petitioner in an endeavor to effect a sale by Jones and his associates of their interest in the tract to petitioner. The foregoing negotiations culminated in the purchase by petitioner on June 3, 1941, of the interest held by Jones and his associates in tract No. 12075. To finance the purchase, the petitioner borrowed *39 $61,020.31 from the Association, which was designated by the latter as loan 174 C, and executed his note dated June 3, 1941, to the Association for that amount. The proceeds of the loan were disbursed as follows: To Jones and associates in
payment for their in-
terest
$11,750.00
To the Association -
Reimbursement of ad-
vances to Jones and
associates: Garage improvements
18,100.00
Taxes
4,000.00
Accrued interest
341.24
$34,191.24
Refinancing 15 conditional sale
contracts into notes and deeds
of trust
26,829.07
Total
$61,020.31
As part of the loan transaction petitioner executed a note for $34,191.24 to C. L. Crabb secured by a second deed of trust from petitioner to Crabb on most of the property in tract No. 12075. Thereupon Crabb assigned the note and second deed of trust to the Association as security for the loan to petitioner of $61,020.31. Also, as part of the loan transaction, 15 house purchasers agreed to refinance their conditional sale contracts into notes and deeds of trust. Out of the loan to petitioner the Association retained $26,829.07 in full payment of the balances owing to it on 15 original notes and deeds of trust executed *40 by Jones and associates. The conditional sale contracts on these 15 houses with balances owing of $34,824.51 were canceled and the property deeded by Jones and associates to the purchasers who executed to Jones notes and deeds of trust in the amount of the balances owing on the contracts. On June 3, 1941, when petitioner acquired the interest of Jones and associates in tract No. 12075, house purchasers owed principal in the amount of $333,642.46 on their conditional sale contracts and notes as follows Notes and deeds of trust
$ 34,824.51
Conditional sale contracts
298,817.95
Total
$333,642.46
On the same date, $285,806.37 was owing to the Association on transactions related to loan 174 C and tract No. 12075 as follows: Loan 174 C
$ 61,020.31
Other notes and deeds of trust
224,786.06
Total
$285,806.37
At the request of the Association the petitioner on June 5, 1941, executed an instrument whereby as security for the payment of any and all of his debts, obligations or liabilities to the Association then or thereafter existing, absolute or contingent, he assigned, transferred to and pledged with the Association: "All notes and deeds of *41 trust securing the same, all conditional sales contracts of real estate, and all other property arising out of, or in any way connected with, said pledged notes and deeds of trust or said pledged conditional sales contracts of real estate, or from the real estate itself covered thereby, heretofore delivered to the Association, or which shall hereafter arise out of, or be in any way connected with said pledged property, and shall be delivered to, or come into the possession, custody, or control of the Association, in any manner, or for any purpose whatever, during the existence of this agreement, and whether held in a general or special account, or in escrow, or in trust, or otherwise * * *" The assignment and transfer made by the foregoing instrument also included any new securities or other property to which the petitioner should or might thereafter become entitled to receive on account of the above-mentioned pledged property and by the instrument the petitioner promised that if he received any of such property, he would immediately deliver it to the Association to be held by it in the same manner as the property originally pledged. Under the assignments by which Frame assigned *42 the conditional sale contracts to the Association the latter was required to pay monthly to Frame or his assignee any excess of monthly collections from house purchasers over the monthly installments due to the Association as loans. One purpose of the assignment of June 5, 1941, was to make an absolute assignment of the properties included therein and thereby not only eliminate the requirement as to monthly payments contained in the Frame assignments but to give the Association the right to accumulate funds as a reserve if it desired and to give the Association, until such time as all of petitioner's obligations owing to it had been paid in full, the discretion to make or to withhold making payment to petitioner of any excess collections in its hands. Upon payment of petitioner's notes executed to the Association for loans 147 C and 151 C, he would be entitled to reassignment of the notes and deeds of trust. Such reassignment would sever the common ownership in the Association of the first and second deeds of trust and thus destroy the collateral value of the second deeds of trust. The assignment of June 5, 1941, also was executed to eliminate the possibility of such a circumstance *43 arising. During 1941 through 1945, the Association collected payments of principal and interest from house purchasers on their conditional sale contracts or notes and entered the collections in detailed accounts maintained for each contract or note. Principal and interest were segregated in these accounts. During this period the Association maintained separate U.M.C. accounts for loans 138 C, 8334, 160 C, 168 C and 174 C. The total collections were entered in the applicable U.M.C. account with no segregation of principal and interest. Within the U.M.C. account the collections were applied to the principal or interest on notes owing to the Association which related to the above-mentioned five loans. This principal and interest were segregated within the U.M.C. accounts. The Association paid to third parties from the U.M.C. account certain expenses relating to properties involved in the above-mentioned loans. Periodically when the balances in the U.M.C. accounts had accumulated to amounts in excess of the amounts the Association considered necessary to secure it, it (the Association) paid such excess amounts to petitioner. The total of such payments for the respective indicated *44 years was as follows: Year
Amount
1941
$ 41,098.84
1942
82,531.58
1943
80,788.98
1944
100,276.61
1945
92,865.93
The total credit balance of $47,994.12 of the impounded accounts acquired by petitioner from Frame and held by the Association as security was released and paid by the Association to the petitioner as follows: Year
Amount
1941
$15,294.10
1942
20,700.02
1944
12,000.00
Total
$47,994.12 The foregoing payments were not handled or paid through the U.M.C. account. During 1941 through 1945, principal was collected from house purchasers on their conditional sale contracts or notes and entered in the U.M.C. account as follows with respect to the indicated loans: Loan
1941
1942
1943
1944
1945
138 C
$ 1,051.42
$ 1,748.87
$ 1,134.00
$ 1,552.39
$ 940.73
160 C
35,221.24
25,168.46
36,245.22
27,487.87
3,408.53
168 C
11,617.56
21,503.12
27,823.24
44,195.24
68,544.57
174 C
15,357.96
28,671.93
48,678.16
35,229.31
52,783.74
8334
96,381.35
143,350.49
204,362.88
358,624.40
435,386.65
Total
$159,629.53
$220,442.87
$318,243.50
$467,089.21
$561,064.22
During 1941 through *45 1945, interest was collected from house purchasers on their conditional sale contracts or notes and entered in the U.M.C. account as follows with respect to the indicated loans: Loan
1941
1942
1943
1944
1945
138 C
$ 461.89
$ 367.64
$ 239.34
$ 170.35
$ 93.70
160 C
5,753.35
5,825.72
3,710.57
1,342.24
603.15
168 C
4,846.54
23,720.76
21,794.47
19,685.19
16,053.30
174 C
16,263.76
20,000.81
16,914.12
13,322.67
9,217.26
8334
99,016.52
106,465.28
96,571.98
79,113.69
51,204.26
Total
$126,342.06
$156,380.21
$139,230.48
$113,634.14
$77,171.67
During 1941 through 1945, interest was applied within the U.M.C. account on notes payable to the Association as follows with respect to the indicated loans: Loan
1941
1942
1943
1944
1945
138 C
$ 225.53
$ 36.98
160 C
6,194.90
4,702.65
$ 2,643.36
$ 430.09
$ 21.77
168 C
10,583.01
18,916.71
15,417.59
16,094.92
12,045.36
174 C
12,471.85
18,915.99
14,534.82
11,351.40
7,506.71
8334
74,506.13
88,635.99
75,334.56
62,037.09
36,556.15
Total
$103,981.42
$131,208.32
$107,930.33
$89,913.50
$56,129.99
During 1941 through 1944, other *46 expenses paid to third parties by the Association from the U.M.C. accounts and properly deductible by the petitioner for the respective years were as follows: 1941
1942
1943
1944
Repossession costs
$ 294.72
$1,560.62
$607.22
$204.80
Collection fees
2,015.00
Escrow expense
12.00
Total
$2,309.72
$1,560.62
$607.22
$216.80
The 139 houses constructed in connection with loan 168 C were sold in 1941 with the petitioner receiving a down payment of $50 from the purchaser of each or a total of $6,950. During 1941, 1942, and 1943, some of the houses related to loans 160 C, 168 C, 174 C and 8334 were repossessed by petitioner. After repossessing the houses it was necessary for the petitioner to paint them and otherwise put them in salable condition. After the houses were put in a salable condition they usually were sold for the same amounts at which originally sold but with down payments ranging from $25 to $50. At the time the houses were repossessed the amounts owed thereon by the purchasers were from $200 to $300 less than the amount the petitioner could resell the houses for on conditional sale contracts for $50 down and $24 per month after *47 putting them in a salable condition. The conditional sale contracts entered into by purchasers of repossessed houses were delivered to the Association to replace the contracts which were in default. Under arrangements with the Association, the down payments received on the original sale of the 139 houses mentioned above and the down payments received on the sale of repossessed houses did not go through the U.M.C. account but were retained by petitioner. A portion of the down payments was used by petitioner to pay his two agents as a commission due them on the sale of each house. Down payments received by petitioner on the sale of repossessed houses were as follows for the indicated years: Year
Amount
1941
$13,995.45
1942
2,525.00
1943
100.00
In his income tax return for 1941 the petitioner reported as income the amount of $15,294.10 paid to him in that year by the Association from the impounded accounts. The amounts of $20,700.02 and $12,000 paid by the Association to the petitioner in 1942 and 1944, respectively, from the impounded accounts were never reported by petitioner on any income tax return or returns. The petitioner did not elect on his income tax *48 returns for the years 1941 through 1945 to report on the installment plan provided in section 44(b) of the 1939 Code his income or gain arising from sources related to the five loans in question, namely, loans 138 C, 160C, 168 C, 174 C and 8334. In his returns for those years total principal and interest collections were reported on the basis of the payments made to him by the Association from the U.M.C. accounts during the respective years, plus down payments received by him from the original sales of houses and the sales of repossessed houses during such years which did not go through the U.M.C. accounts. Interest expense was reported on the basis of interest applied to the Association's loans within the U.M.C. accounts before payments were made to the petitioner. In petitioner's income tax return for 1941 no deduction or other offset was taken as or for a recovery of capital with respect to any of the loans. In petitioner's returns for 1942 through 1945 a return of capital was deducted as a recovery of "out-of-pocket costs" incurred by petitioner with respect to the properties related to the five loans. These costs did not go through the U.M.C. accounts. The amounts so deducted *49 were computed at 32 per cent for 1942 and 37.4 per cent for 1943 through 1945 of the amounts reported as receipts from the Association paid from the U.M.C. account, plus receipts from down payments received on the sale of houses. In determining the deficiencies in question, the respondent determined that for each year income was realized in the amount of 75.9232 per cent of principal collected under loan 138 C and in the amount of 19.3305 per cent of the combined principal collected under loans 160 C, 168 C, 174 C and 8334 as follows: Principal to be
collected from
Obligations to be
Percentage of
house pur-
deducted by
Income to be
principal real-
Loan
chasers
Association
realized
ized as income
(a)
(b)
(b / a)
138 C
$ 10,383.46
$ 2,500.00
$ 7,883.46
75.9232
160 C
$ 128,840.24
$ 128,840.24
168 C
383,400.00
311,591.89
174 C
333,642.46
285,806.37
8334
1,799,602.47
1,407,861.10
Total
$2,645,485.17
$2,134,099.60
$511,385.57
19.3305
Following an investigation made by it of the affairs of the Association, the Home Loan Bank Board on May 20, 1946, took over the Association's business and assets. Thereafter the affairs *50 of the Association were administered by a conservator until January 24, 1948, when the business and assets of the Association were returned to its elected officials. Immediately following the Home Loan Bank Board's taking over of the assets and business of the Association a lawsuit was instituted in the District Court of the United States for the Southern District of California on behalf of the Association against officials of the Home Loan Bank Board whom the United States District Attorney in Los Angeles, California, was called upon to represent. At the time the assets and business of the Association were taken over, two agents of the Home Loan Bank Board who had done considerable work with respect to the Association's affairs were working in the District Attorney's office. Subsequent to the seizure the agents brought oral and written reports to the District Attorney as to what they found at the Association. By the fall of 1946 there had been brought to the attention of the District Attorney information which indicated to him that there had been possible income tax violations by John D. Willhoit and by Charles Jones and Clifton Jones, who were brothers. The District Attorney informed *51 the Justice Department that information which had been brought to his attention indicated that there might have been criminal violations of the income tax laws by these men who were builders and who had been financed in whole or in part by the Association. The District Attorney asked the Justice Department to request the Treasury Department to make an expeditious investigation of the income tax liability of the three men and report to him the result of its investigation. The Justice Department made the request to the Treasury Department as the District Attorney had asked and the Treasury Department proceeded with the desired investigations, the investigation in the case of John D. Willhoit extending from October 1946 to or about March 1948 with revenue agents reporting from time to time to the District Attorney. Willhoit was never indicted nor was any indictment of him ever sought by the District Attorney or his successor in office. The taking over of the assets and business of the Association by the Home Loan Bank Board and the developments which followed, including the investigation of the petitioner's income tax liability, were attended by a substantial amount of publicity. For *52 the taxable years 1943, 1944, and 1945, the petitioners and the respondent executed timely consents in writing extending the period of limitations upon assessment of income tax for the respective years to June 30, 1951. The petitioners' execution of such consents was at the request of the respondent but was voluntary and was not as a result of duress. The deficiency notice to petitioner John D. Willhoit for the years 1941 through 1945 and the deficiency notice to petitioner Eleanor M. Willhoit for the years 1943 through 1945 were mailed to them, respectively, by the respondent on November 2, 1950. Opinion Without making distinction as to the character of the transactions to which the various loans related and irrespective of what larger amounts of principal might have been collected by the Association from house purchasers with respect to the various loans, the petitioner in his income tax returns for the years 1941 through 1945 treated the amounts paid to him during the respective years by the Association from the U.M.C. accounts as gross receipts from his "Real Estate-Installment Sales" business. Such amounts plus down payments received on the sales of houses were treated as *53 total gross receipts. Beginning with 1942 and continuing through 1945, a deduction was taken each year from gross receipts for costs or a return of capital in computing net income. In his determination of the deficiencies the respondent determined that 75.9232 per cent of the amounts of principal collected by the Association from house purchasers with respect to loan 138 C and 19.3305 per cent of the combined amounts of principal collected by the Association from house purchasers with respect to loans 160 C, 168 C, 174 C and 8334 represented income to the petitioner for the respective years in which collected by the Association. The petitioner points out that the legal title to all of the real estate to which the various loans related had been conveyed to trustees and that the legal title to all of the conditional sale contracts of such real estate had been assigned to the Association by various assignments. He contends that by reason of the foregoing and of the assignment executed by him to the Association on June 5, 1941, the Association could withhold payments to him at its discretion or until the total amount of the loans in question had been paid in full. He urges that in *54 such situation all of the assets to which the loans related were subject to the contingency that his capital investment therein might never be recovered and further contends that he erred in reporting as income any portion of the payments made to him by the Association from the U.M.C. accounts during the taxable years in question and that the respondent erred in determining that any portion of the payments of principal collected by the Association from house purchasers during such years constituted income to him. Relying on Burnet v. Logan, 283 U.S. 404, petitioner urges that because of the contingency that his capital investment might never be recovered, his income from the collections of principal by the Association from house purchasers relative to the above-mentioned five loans taken as a unit should be determined by the deferred payment recovery-of-cost method. A summarized statement of the result of petitioner's proposed application of that method to January 1, 1946, is set out in his brief as follows: Total costs to be recovered
$2,290,351.71
Less capital recovered 1941 through
1945
1,798,033.90
Unrecovered costs January 1, 1946
$ 492,317.81
*55 The question before the Court in Burnet v. Logan, supra, was whether as in part payment for shares of corporate stock the receipt by the taxpayer of a right to share in possible proceeds of a contract thereafter to pay indefinite and indeterminable sums resulted in the realization of income to the taxpayer who reported her income on the cash basis. Concluding that such contract had no ascertainable fair market value the Court decided the question in the negative. The petitioner does not point us to any note, conditional sale contract, or other arrangement involved herein which called for the payment of any indefinite or indeterminable sum. So far as ascertainable from the record, all notes, contracts or other arrangements were for the payment of definite and specified or determinable amounts. It is true that petitioner's interest in the various properties involved herein had been pledged to the Association as collateral security for the payment of obligations owing to the Association. It is also true that the exact total amounts of income or gain the petitioner would ultimately realize upon the liquidation of his interest in the various properties was not determinable *56 during the taxable years. However, this was not due to the indefiniteness or lack of determinability of the sums involved but was dependent upon the ability and willingness - elements involved in all sales other than sales for cash - of house purchasers to make payment of the specified sums they had agreed to pay. In view of the foregoing and since we are unable to find that petitioner's interest in the various properties involved therein taken as a unit had no ascertainable fair market value, we are unable to conclude as petitioner contends that the rule of Burnet v. Logan, supra, is applicable here and that accordingly he is entitled to report income therefrom by the deferred payment recovery-of-cost method. Because the various loans in question involved separate and distinct transactions and in some respects determinative factual differences, we do not think that the determination of the petitioner's income from collections of principal with respect to them is to be made by the application of a single blanket rule as petitioner has proposed. In our opinion the collections relating to the various loans are to be accorded separate consideration. At this point it is *57 to be observed that the fact that the properties with respect to which the collections were made had been pledged as collateral security to the Association does not prevent such collections as are in fact income to him from being taxed as such. In other words, the petitioner may not accumulate and defer income by pledging its source to another. G. R. Fouche, 6 T.C. 462; Samuel E. Diescher, 36 B.T.A. 732, aff'd 110 Fed. (2d) 90, certiorari denied 310 U.S. 650. The amounts of principal collected by the Association with respect to loan 138 C were collected on 22 interest-bearing notes, payable in monthly installments, and secured by second deeds of trust on 22 houses. The notes had been purchased by petitioner from Frame on August 25, 1939, at which time the petitioner assigned them to the Association as security for a loan of $6,000. Petitioner purchased the notes for $5,000 and used that amount of the foregoing loan to pay the purchase price. Principal in the amount of $10,383.46 remained to be paid on the notes at the time the petitioner purchased them. As a consequence the petitioner purchased the notes at a discount of 51.846 *58 per cent of their face value. The payment to the petitioner, or to the Association for his account, of the full amount of the notes by the makers thereof will not represent a sale or exchange of capital assets but merely the payment of an indebtedness by the makers. Hale v. Helvering, 85 Fed. (2d) 819. A percentage of each payment of principal of the notes can fairly be regarded as ordinary income. Victor B. Gilbert, 6 T.C. 10; Shapfa Realty Corporation, 8 B.T.A. 283. Since the petitioner purchased the notes at a discount of 51.846 per cent of their face value, that percentage of the installment collections of the principal of the notes together with that portion of each payment which represents interest collected by the Association represents income taxable to the petitioner for the years in which collected. The amounts of principal collected by the Association with respect to loan 160 C were collected on 66 notes which the petitioner had purchased from the Association on January 30, 1941, at a cost of $128,840.24 and at a time when principal in the amount of $128,840.24 remained to be paid thereon. Since the cost to the petitioner of the *59 notes and the amount of principal remaining to be paid thereon were identical, all collections of principal on these notes constituted a return of capital and no income was realized by petitioner as a result of such collections. The evidence shows that the petitioner purchased the notes, all of which were delinquent, primarily as an accommodation to the Association since he was prepared to handle the notes, collections on which had become a problem to the Association. The only income the petitioner could possibly realize was the difference between the rate of interest he paid on his loan from the Association and the higher rates the purchased notes bore. This differential would be interest and not principal. Loan 168 C represents construction loans totaling $278,000 made by the Association. Using the proceeds of the loans and $82,844 of his personal funds, or a total of $360,844, the petitioner constructed 139 houses which he sold during 1941 on conditional sale contracts under the terms of which the purchasers' payments were $50 down and $24 a month. The total selling prices stated in the contracts was $383,400. The contracts were assigned to the Association as security for its *60 loans. The Association also held deeds of trust to the houses and lots as security for its loans. Under the provisions of section 44(b) of the 1939 Code a taxpayer who sells real property and the initial payments, that is, the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale is made, do not exceed 30 per cent of the selling price, may elect to return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed bears to the total contract price. Regulations 103 permit the vendor to return income from installment sales on the accrual or cash receipts basis and when so reported the sales are treated as deferred payment sales not on the installment plan. Section 19.44-2. In ascertaining the amount of profit or loss from that class of sales, the obligations of the purchaser to the vendor are taken at their fair market value. If the obligations have no fair market value, the payments in cash or other property having a fair market value shall be applied against and reduce the *61 basis of the property sold, and, if in excess of such basis, shall be taxable to the extent of the excess. Gain or loss is realized when the obligations are disposed of or satisfied, the amount being the difference between the reduced basis and the amount realized therefor. Section 19.44-4. The use of the installment plan for reporting income from the sale of real property is optional with the taxpayer and where he does not elect in his income tax return for a given year to employ it, his election is binding on him and the Commissioner, and neither may thereafter use that plan in the determination of the taxpayer's income for such year. Pacific National Co. v. Welch, 304 U.S. 191; United States v. Kaplan, 304 U.S. 195. Although the petitioner did not elect on his income tax returns for 1941 through 1945 to report on the installment plan his gain from the sale of the 139 houses and lots, the respondent in determining the petitioner's gain has employed that plan. In reporting his gain from the sales, the petitioner employed the cash receipts basis with deductions for costs or a return of capital. If, as here, a taxpayer does not elect to use the installment *62 plan for reporting gain, the use of the cash receipts basis is permissible under the regulations where the taxpayer, as in the instant case, keeps his books on the cash basis. In ascertaining the gain or loss where the cash receipts basis is used, the obligations of the purchaser to the vendor are taken at their fair market value. If the obligations have no fair market value, the payments in cash or other property having a fair market value must be applied against and reduce the basis of the property sold, and, if in excess, are taxable to the extent of the excess. The petitioner did not receive from the purchasers any notes, bonds, mortgages or other evidence of indebtedness aside from the conditional sale contracts. The conditional sale contracts had no more effect in this situation than to evidence the amounts due the petitioner over a period of years and therefore can be regarded as little more than accounts receivable. As such they are not to be valued by a cash basis taxpayer and that value included in the amount realized from the sale of the properties. Estate of Coid Hurlburt, 25 T.C. 1286, and cases cited. In the situation here presented and since the cost *63 or basis for the 139 houses and lots was $360,844, the total selling price was $383,400 and the total collections through 1945 of the principal of the conditional sale contracts, or selling price, including the down payments received at the time of sale, was only approximately $180,500, we conclude that the petitioner did not in any of the years 1941 through 1945 realize any taxable gain from the sale of the properties. Loan 174C in the amount of $61,020.31 was made by the Association to petitioner on June 3, 1941, to finance the petitioner's purchase on that date of the interest of C. S. Jones and his associates in the conditional sale contracts entered into by purchasers of 143 houses and lots in tract No. 12075. At the time of the petitioner's purchase of such interest, a total of $333,642.46 was owing by house purchasers on their contracts and $224,786.06 was owing to the Association on account of its loans. Adding the petitioner's loan of $61,020.31 to the latter amount gives a total of $285,806.37 owing to the Association with respect to matters relating to loan 174C. In determining the petitioner's income from the conditional sale contracts here under consideration, we are *64 of the opinion that the rule applied in determining the petitioner's income from notes involved in loan 138C is applicable here. Since the contracts being considered here were acquired at a discount of 14.337 per cent of face value, we hold that that percentage of the installment collections of the principal of the contracts by the Association represents income taxable to the petitioner for the years in which collected by the Association. Loan 8334 in the amount of $110,000 was made by the Association to petitioner in connection with the petitioner's purchase on January 27, 1941, of Frame's interests in and with respect to seven tracts of land on which houses had been constructed by Frame with loans furnished by the Association. The interests acquired from Frame by the purchase consisted of: (1) Frame's interest in approximately 800 conditional sale contracts involving approximately 800 lots and the improvements thereon which had been assigned to the Association as security for the repayment of construction loans, and (2) Frame's interest in the impounded accounts with the Association standing in his name which had been pledged to the Association as additional security for repayment *65 of construction loans. Aside from the loan of $110,000 heretofore mentioned which the petitioner obtained from the Association to finance the purchase of Frame's interests, the petitioner agreed to pay the Association $40,000 as a commission, and canceled an indebtedness owing to him by Frame in an amount in excess of the indebtedness owing by him to Frame which Frame canceled. The position of the petitioner is that at the time he acquired Frame's interests Frame owed him in excess of $60,000 more than he owed Frame and that his cancellation of such excess amount constituted a portion of his cost of Frame's interest. From the evidence of record we are unable to find that the excess indebtedness canceled by petitioner amounted to $60,000 or more, but we are satisfied from the evidence that the excess indebtedness canceled was in a substantial amount. Accordingly, under the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, we have found such amount to be $5,000. Consequently, the cost to the petitioner of Frame's interests was $155,000. At the time the petitioner purchased Frame's interests, house purchasers owed $1,799,602.47 of principal on their conditional sale contracts *66 and the unpaid balance owing to the Association on notes for construction loans was $1,297,861.10. The total credit balance in the impounded accounts was $47,994.12. The total of the amount owed by house purchasers, $1,799,602.47 and the impounded accounts in the amount of $47,994.12 is $1,847,596.59, and the total of the amounts owing to the Association on notes for construction loans, $1,297,861.10, and the $155,000 owing by petitioner to the Association and on account of canceled indebtedness is $1,452,861.10. In our opinion the rule applied in determining the petitioner's income with respect to loans 138C and 174C is applicable in determining the petitioner's income with respect to loan 8334. Accordingly, since the contracts and impounded accounts involved in the latter loan were acquired at a discount of 21.365 per cent of face value, we hold that that percentage of the installment collections of the principal of the contracts by the Association represents income taxable to the petitioner for the years in which collected by the Association and that a like percentage of the impounded accounts represents income to the petitioner for the years in which paid by the Association to *67 the petitioner. From statements contained in the petitioner's brief it appears that our findings and the foregoing holdings respecting the petitioner's income or gain relative to the five loans, along with certain stipulated facts, dispose of all matters in controversy between the parties respecting the determination of the income of the petitioners for the taxable years involved herein. Taking the position that the consents in writing for extending the period of limitations for assessment of income tax for the years 1943 through 1945, respectively, were executed by petitioners under duress and were not executed by them freely and voluntarily, the petitioners contend that the consents therefore were ineffective for extending the period of limitations and that consequently assessment of tax for the years 1943 through 1945 is now barred. The respondent contends that the petitioners' execution of the consents was voluntary and was not as a result of duress. Viewing the evidence bearing on this issue in the light most favorable to the petitioners, we have concluded and found as a fact that the petitioners' execution of the consents was voluntary and was not as a result of duress. *68 The respondent is sustained as to this issue. Decisions will be entered under Rule 50.