## BURNET, COMMISSIONER OF INTERNAL REVENUE, *v.* LOGAN.

## SAME *v.* BRUCE.

Nos. 521 and 522. Argued April 29, 1931.—Decided May 18, 1931.

*Assistant Attorney General Youngquist,* with whom *Solicitor General Thacher* and *Messrs. Sewall Key* and *J. Louis Monarch,* Special Assistants to the Attorney General, and *Whitney North Seymour* were on the brief, for petitioner.

406

*Messrs. Herbert C. Smyth* and *John Enrietto,* with whom *Messrs. Millard F. Tompkins* and *John W. Ford* were on the brief, for Mrs. Logan.

408

*Mr. Raymond B. Goodell,* with whom *Mr. Walter M. Anderson* was on the brief, for Mrs. Bruce.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

These causes present the same questions. One opinion, stating the essential circumstances disclosed in No. 521, will suffice for both.

Prior to March, 1913, and until March 11, 1916, respondent, Mrs. Logan, owned 250 of the 4,000 capital shares issued by the Andrews & Hitchcock Iron Company. It held 12% of the stock of the Mahoning Ore & Steel Company, an operating concern. In 1895 the latter corporation procured a lease for 97 years upon the " Mahoning " mine and since then has regularly taken therefrom large, but varying, quantities of iron ore—in 1913, 1,515,-428 tons; in 1914, 1,212,287 tons; in 1915, 2,311,940 tons; in 1919, 1,217,167 tons; in 1921, 303,020 tons; in 1923, 3,029,865 tons. The lease contract did not require production of either maximum or minimum tonnage or any definite payments. Through an agreement of stockholders (steel manufacturers) the Mahoning Company is obligated to apportion extracted ore among them according to their holdings.

On March 11, 1916, the owners of all the shares in Andrews & Hitchcock Company sold them to Youngstown Sheet & Tube Company, which thus acquired, among other things, 12% of the Mahoning Company's stock and the right to receive the same percentage of ore thereafter taken from the leased mine.

For the shares so acquired the Youngstown Company paid the holders $2,200,000 in money and agreed to pay annually thereafter for distribution among them 60 cents for each ton of ore apportioned to it. Of this cash Mrs. Logan received 250/4000ths—$137,500; and she became entitled to the same fraction of any annual payment thereafter made by the purchaser under the terms of sale.

Mrs. Logan's mother had long owned 1100 shares of the Andrews & Hitchcock Company. She died in 1917, leaving to the daughter one-half of her interest in payments thereafter made by the Youngstown Company. This bequest was appraised for federal estate tax purposes at $277,164.50.

During 1917, 1918, 1919 and 1920 the Youngstown Company paid large sums under the agreement. Out of these respondent received on account of her 250 shares $9,900.00 in 1917, $11,250.00 in 1918, $8,995.50 in 1919, $5,444.30 in 1920—$35,589.80. By reason of the interest from her mother's estate she received $19,790.10 in 1919, and $11,977.49 in 1920.

Reports of income for 1918, 1919 and 1920 were made by Mrs. Logan upon the basis of cash receipts and disbursements. They included no part of what she had obtained from annual payments by the Youngstown Company. She maintains that until the total amount actually received by her from the sale of her shares equals their value on March 1, 1913, no taxable income will arise from the transaction. Also that until she actually receives by reason of the right bequeathed to her a sum equal to its

appraised value, there will be no taxable income therefrom.

On March 1, 1913, the value of the 250 shares then held by Mrs. Logan *exceeded* $173,089.80—the total of all sums actually received by her prior to 1921 from their sale ($137,500.00 cash in 1916 plus four annual payments amounting to $35,589.80). That value also exceeded original cost of the shares. The amount received on the interest devised by her mother was less than its valuation for estate taxation; also less than the value when acquired by Mrs. Logan.

The Commissioner ruled that the obligation of the Youngstown Company to pay 60 cents per ton had a fair market value of $1,942,111.46 on March 11, 1916; that this value should be treated as so much cash and the sale of the stock regarded as a closed transaction with no profit in 1916. He also used this valuation as the basis for apportioning subsequent annual receipts between income and return of capital. His calculations, based upon estimates and assumptions, are too intricate for brief statement.* He made deficiency assessments according to the view just stated and the Board of Tax Appeals approved the result.

---

* In the brief for petitioner the following appears:

" The fair market value of the Youngstown contract on March 11, 1916, was found by the Commissioner to be $1,942,111.46. This was based upon an estimate that the ore reserves at the Mahoning mine amounted to 82,858,535 tons; that all such ore would be mined; that 12 per cent (or 9,942,564.2 tons) would be delivered to the Youngstown Company. The total amount to be received by all the vendors of stock would then be $5,965,814.52 at the rate of 60 cents per ton. The Commissioner's figure for the fair market value on March 11, 1916, was the then worth of $5,965,814.52, upon the assumption that the amount was to be received in equal annual installments during 45 years, discounted at 6 per cent, with a provision for a sinking fund at 4 per cent. For lack of evidence to the contrary this value was approved by the Board. The value of the 550/4000 interest

The Circuit Court of Appeals held that, in the circumstances, it was impossible to determine with fair certainty the market value of the agreement by the Youngstown Company to pay 60 cents per ton. Also, that respondent was entitled to the return of her capital—the value of 250 shares on March 1, 1913, and the assessed value of the interest derived from her mother—before she could be charged with any taxable income. As this had not in fact been returned, there was no taxable income.

We agree with the result reached by the Circuit Court of Appeals.

The 1916 transaction was a sale of stock—not an exchange of property. We are not dealing with royalties or deductions from gross income because of depletion of mining property. Nor does the situation demand that an effort be made to place according to the best available data some approximate value upon the contract for future payments. This probably was necessary in order to assess the mother's estate. As annual payments on account of extracted ore come in they can be readily apportioned first as return of capital and later as profit. The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions and speculation.

---

which each acquired by bequest was fixed at $277,164.50 for purposes of Federal estate tax at the time of the mother's death.

" During the years here involved the Youngstown Company made payments in accordance with the terms of the contract, and respondents respectively received sums proportionate to the interests in the contract which they acquired by exchange of property and by bequest.

" The Board held that respondents' receipts from the contract, during the years in question, represented 'gross income'; that respondents should be allowed to deduct from said gross income a reasonable allowance for exhaustion of their contract interests; and that the balance of the receipts should be regarded as taxable income."

When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000.00 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. Respondent might never recoup her capital investment from payments only conditionally promised. Prior to 1921 all receipts from the sale of her shares amounted to less than their value on March 1, 1913. She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture.

"In order to determine whether there has been gain or loss, and the amount of the gain, if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration." *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 184, 185. Rev. Act 1916, § 2, 39 Stat. 757, 758; Rev. Act 1918, c. 18, 40 Stat. 1057. Ordinarily, at least, a taxpayer may not deduct from gross receipts a supposed loss which in fact is represented by his outstanding note. *Eckert* v. *Commisioner of Internal Revenue, ante,* p. 140. And, conversely, a promise to pay indeterminate sums of money is not necessarily taxable income. "Generally speaking, the income tax law is concerned only with realized losses, as with realized gains." *Lucas* v. *American Code Co.*, 280 U. S. 445, 449.

From her mother's estate Mrs. Logan obtained the right to share in possible proceeds of a contract thereafter to pay indefinite sums. The value of this was assumed to be $277,164.50 and its transfer was so taxed. Some valuation—speculative or otherwise—was necessary in order to close the estate. It may never yield as much, it may

yield more. If a sum equal to the value thus ascertained had been invested in an annuity contract, payments thereunder would have been free from income tax until the owner had recouped his capital investment. We think a like rule should be applied here. The statute definitely excepts bequests from receipts which go to make up taxable income. See *Burnet* v. *Whitehouse, ante,* p. 148.

The judgments below are

*Affirmed.*