STEPHEN H. DORSEY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3149–65, 6569–65, 6594–65, 6809–65, 6994–65,  Filed March 15, 1968.
7061–65, 206–66, 274–66, 314–66, 439–66, 444–66,
532–66, 570–66, 1317–66, 1319–66, 1440–66, 1441–66,
1787–66, 1872–66, 5878–66, 5879–66, 5887–66, 6164–66.

*George O. Philips* and *Francis E. Marshall,* for the petitioners.
*Dennis C. DeBerry,* for the respondent.

[1] Consolidated herewith for trial, briefing, and opinion are: Leonard R. Oler and Ida Oler, docket No. 6569–65; Stanley E. Oler and Florence Oler, docket No. 6594–65; Helen G. Winchester and Edgar T. Winchester, docket No. 6809–65; William B. Dorsey, Jr., docket No. 6994–65; William B. Dorsey and Ida S. Dorsey, docket No. 7061–65; Helen S. Hammell, docket No. 206–66; W. Ernest Flemming and Aileen Flemming, docket No. 274–66; Paul Hollingsworth and Elizabeth Hollingsworth, docket No. 314–66; Edward W. Howe and Blanche G. Howe, docket No. 439–66; Alwyn L. Newman and Lillian R. Newman, docket No. 444–66; Ruth Hollingsworth, docket No. 532–66; Elsie H. Luethy, docket No. 570–66; Estate of Myrtle M. Oler Teichmann, deceased (Edward I. Berry, Executor), docket No. 1317–66; Estate of Myrtle M. Oler (Edward I. Berry, Executor), docket No. 1319–66; Estate of Harman E. Baugh, deceased (Olga G. Baugh, Executrix), docket No. 1440–66; Estate of Harman E. Baugh, deceased (Olga G. Baugh, Executrix) and Olga G. Baugh, as survivor, docket No. 1441–66; William R. Stover and Anna M. Stover, docket No. 1787–66; Joseph C. Clark and Margaret R. Clark, docket No. 1872–66; Bruno Gallia and Frances Gallia, docket No. 5878–66; Helen G. Winchester and Edgar T. Winchester, docket No. 5879–66; Mary E. Levis, docket No. 5887–66; Matthew Hollingsworth, Jr., docket No. 6164–66.

608

610

612

616

620

OPINION

The deficiencies determined in these cases stem from a dispute as to whether amounts received by the petitioners during the years in question should be taxed as long-term capital gains or as ordinary income. The controversy arises from the fact that the petitioners were stockholders of the Pinsetter Co. which liquidated and distributed its assets in kind to them. The distribution was in the form of participating certificates in the right to receive for a period of 20 years from February 4, 1947, 1 percent of all receipts by AMF from the sale or lease of automatic pinsetting machines. Petitioners contend that the participating certificates they received had no acertainable fair market value on September 16, 1954, the date of liquidation. Therefore, the liquidation was an "open transaction" [2] so that all amounts received by them were taxable as long-term capital gains. Respondent counters by asserting that the participating certificates had an ascertainable fair market value on September 16, 1954; that such fair market value was $8 per certificate share; and that the liquidation was a "closed transaction." It is respondent's position that all income subsequently received by petitioners from AMF must be categorized separately from the final liquidation receipt of the participating certificates; and, to the extent such income exceeds the basis of each petitioner in the certificates, the amounts received should be taxed as ordinary income.

The open transaction approach is desirable from the petitioners' viewpoint since it permits them to report the amounts when received as capital gains and permits them to avoid immediate recognition of that gain. The Commissioner, on the other hand, has sought to limit the operation of the open transaction doctrine by maintaining that almost every obligation can and should be valued upon receipt, so that the original sale or exchange transaction can be "closed" at that point. Indeed, the Commissioner insists on valuing "contracts and claims to receive indefinite amounts of income, such as those acquired with re-

---

[2] Where the fair market value of an obligation received upon a sale or exchange cannot be ascertained, the original sale or exchange transaction remains open, and payments ultimately received under the obligation are treated exactly as they would have been if received at the time of the sale or exchange. *Westover v. Smith,* 173 F. 2d 90 (C.A. 9, 1949).

spect to stock in liquidation of a corporation, except in rare and extraordinary cases." See Rev. Rul. 58–402, 1958–2 C.B. 15.[3] This revenue ruling attempts to confine the bellwether case of *Burnet* v. *Logan*, 283 U.S. 404 (1931), narrowly to its facts, by treating it not as laying down any general rule that contracts for indefinite payments have no ascertainable value, but rather as holding that due to the particular uncertainties in that situation the taxpayer was entitled to recover his entire basis before having to recognize any gain.

Despite respondent's contention that this is not a "rare" situation, we begin with the premise that where, in rare circumstances, a contract right received in a sale or exchange does not have an ascertainable fair market value at the time it is received, special treatment is necessary. *Ayrton Metal Co.* v. *Commissioner*, 299 F. 2d 741 (C.A. 2, 1962). Gain or loss cannot be computed at the time of the sale or exchange, so the transaction is not considered closed. *Burnet* v. *Logan, supra; Susan J. Carter*, 9 T.C. 364 (1947), affd. 170 F. 2d 911 (C.A. 2, 1948). We think the instant cases require such special treatment because the value of the rights received by petitioners on September 16, 1954, depended upon numerous uncertainties of such a character as to make any estimate of the fair market value of those rights on that date sheer surmise and speculation. See and compare *Ayrton Metal Co.* v. *Commissioner, supra; United States* v. *Yerger*, 55 F. Supp. 521 (E.D. Pa. 1944); *Frank H. Hoy*, T.C. Memo. 1958–28; *John H. Altorfer*, T.C. Memo. 1961–48; *George J. Lentz*, 28 T.C. 1157 (1957); *J. C. Bradford*, 22 T.C. 1057 (1954); and *Jones* v. *Squire*, an unreported case (W.D. Wash. 1956), 51 A.F.T.R. 1195, 56–2 U.S.T.C. par. 9669.

Here, as in *Burnet* v. *Logan, supra*, the petitioners received a "promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." A fair preponderance of the evidence in this record supports the position of petitioners that their contract rights with AMF had no ascertainable fair market value on September 16, 1954. Among the principal uncertainties and contingencies which existed on September 16, 1954, were:

1. *Conditions prevalent in the bowling industry*, particularly the unsavory past reputation of bowling and its unknown future potential.

---

[3] The general thrust of the revenue ruling is echoed in sec. 1.1001–1(a), Income Tax Regs., which states that "only in rare and extraordinary cases will property be considered to have no fair market value." This statement seems to impose an even more stringent limitation upon the use of the open transaction doctrine because, if read literally, it appears to require the taxpayer to prove that the obligation received had no value at all, rather than merely that its value cannot be ascertained. However, we think it more reasonable to construe the regulation by emphasizing the word "fair" in the phrase "no fair market value," so that an obligation need not be valued where there is no rational basis for determining what its fair value is. Cf. *Slater* v. *Commissioner*, 356 F. 2d 668 (C.A. 10, 1966).

2. *Obstacles to the success of automatic pinsetters within the bowling industry*, including the uncertainty as to their acceptance by the public and by bowling proprietors, their unproven status as a unique new product, and marketing problems.

3. *Problems facing the AMF pinsetter,* such as patent infringement suits, the quantity and quality of competition, especially from Brunswick Corp., the fact that AMF was a newcomer to the bowling industry in 1954, and the pinsetter's unproven character.

4. *Difficulties of ascertaining how much of any success would actually redound to the participating certificate holders*, this being a consequence of AMF's control and constant changing of pinsetter prices, AMF's control of all marketing and management decisions, and the possibility that AMF could have operated its own pinsetting machines rather than sell or lease them, in which event the petitioners would have received no payments.

In short, without relying solely on any specific factor, we believe that the participating certificates had no ascertainable fair market value on September 16, 1954, and that the transaction before us must be treated as an "open" transaction. Our position is buttressed by four expert witnesses who testified that, in their respective opinions, it was impossible on September 16, 1954, to ascertain a fair market value of the contract rights received by petitioners upon the final liquidation of Pinsetter Co. This was also the opinion of Hastings and Downey, officers of AMF who were thoroughly familiar with the pinspotters and with the AMF-Pinsetter contract. Hastings was an employee of the company for many years prior to 1948 and was vice president and director of patents from 1948 to 1964. Downey was formerly a vice president in charge of the bowling division of the company and is now a consultant and a director of AMF.

The evidence of "offers" for the stock of Pinsetter before liquidation and for the participating certificates after liquidation, as stressed by respondent, is not helpful. Such "offers" were mere talk and far from actual sales. In addition, the few sales of stock or participating certificates which were made occurred at unrelated times and were unusual and atypical.

The cases cited and relied upon by respondent are distinguishable. We think they fall into four major categories. In the first category are those in which there was an established industry with sufficient criteria for ascertaining fair market value. Among these are the motion picture cases in which a corporation owning a motion picture dissolved and transferred to its stockholders the right to receive "royalties" from the production of the picture. See, e.g., *Pat O'Brien*, 25 T.C. 376 (1955) ; and *Grill* v. *United States*, 303 F. 2d 922 (Ct. Cl. 1962).

In such cases the motion-picture industry has developed a formula through years of experience by which it can estimate the royalties to be expected from a motion picture. Of the same ilk are cases involving the transfers of the rights to renewal commissions of insurance agents. See *Estate of Abraham Goldstein*, 33 T.C. 1032 (1960). Moreover, the motion-picture cases dealt with true royalty contracts which would produce ordinary income in the hands of the corporation. We view this as quite different from the instant cases in which the receipt of money is not a royalty but rather a part of the purchase price of the asset.

In the second category are cases in which the courts simply concluded that insufficient proof was presented. See, e.g., *Chamberlin* v. *Commissioner*, 286 F. 2d 850 (C.A. 7, 1960), affirming 32 T.C. 1098 (1959); *Slater* v. *Commissioner*, 356 F. 2d 668 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court; and *Boudreau* v. *Commissioner*, 134 F. 2d 360 (C.A. 5, 1943), affirming 45 B.T.A. 390 (1941). In the *Chamberlin* case, the taxpayer contended that contracts to receive installment payments from an invention, by their very nature, had no ascertainable fair market value. He offered no other evidence. This Court disagreed, holding that ascertainable fair market value was a question of fact with the taxpayer having the burden of proof, a burden which he failed to carry. Even if the taxpayer had offered more evidence, he was confronted with facts that do not exist in the present cases, namely: (1) That the product involved was not unique; (2) that there was a considerable history of almost level annual receipts both before and after the date of liquidation; and (3) that there had been sales of the same asset at times and under circumstances comparable to those present in that liquidation. The *Slater* and *Boudreau* cases also turned on their particular facts and in each case there was a failure of proof.

In cases falling in the third category, the taxpayer initially took a position that his rights had an ascertainable fair market value, but later tried to reverse himself. See *Pat O'Brien, supra; Slater* v. *Commissioner, supra; Campagna* v. *United States*, 290 F. 2d 682 (C.A. 2, 1961); and *Marsack's Estate* v. *Commissioner*, 288 F. 2d 533 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. For example, in the *Marsack* case, since the earnings had been stable for 6 years preceding the date of liquidation and for 7 years subsequent thereto, and since it was known when the patents would expire, this Court found it was possible to calculate the future income as of the date of liquidation. In affirming our decision, the Court of Appeals emphasized the fact that the taxpayer himself had set a fair market value at the date of liquidation. It said:

This was at a time which predates the present tax controversy. It is true that three years later, in filing a claim for tax refund, he claimed he made a mistake. Nevertheless, Marsack who knew the value of the licensing agreements better, perhaps, than anyone else, voluntarily fixed the value of the licensing agreements at $22,500. This was a statement against interest and the Tax Court was entitled to give it weight.

Furthermore, we think it is significant that the Court of Appeals in *Marsack* was careful to note that—

our decision herein, as well as our decision in *Chamberlin*, does not mean that speculative contracts which contain highly contingent possibilities of future realization of income, can and must be valued for income tax purposes as a matter of law. *The question is one of fact and not of law.* We recognize there have been cases where courts have properly considered a contract so speculative and contingent as to make impossible the ascertainment of market value. But that is not the case here. [Emphasis added.]

In the fourth and last category are the cases which involve March 1, 1913, values or estate tax valuations where the problem was such that there had to be an immediate determination of value without awaiting future experience. See, e.g., *Burnet* v. *Houston*, 283 U.S. 223 (1931); and *Commissioner* v. *Sternberger's Estate*, 348 U.S. 187 (1955).

All in all, it is our view that the best solution in these cases is to allow the amounts actually received by petitioners in years after September 16, 1954, to be taxed as part of their long-term capital gains from the liquidation of their shares in Pinsetter Co. stock. We so hold.

We turn next to the subsidiary issue relating to income in respect of a decedent. The Estate of Harman E. Baugh contends that it was correct in not treating the amounts received during the taxable period from July 25 through December 31, 1963, under the participating certificates as capital gains, apparently on the theory that those amounts were a partial recovery of its "bases" in the participating certificates as established by their valuation on decedent's Federal estate tax return. Respondent, on the other hand, contends that such amounts were income in respect of a decedent under section 691(a)(1).[4] Respondent

---

[4] SEC. 691. RECIPIENTS OF INCOME IN RESPECT OF DECEDENTS.
(a) INCLUSION IN GROSS INCOME.—
(1) GENERAL RULE.—The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the amount of all items of gross income in respect of a prior decedent, if the right to receive such amount was acquired by reason of the death of the prior decedent or by bequest, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:
(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;
(B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or
(C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.

concedes that the estate is entitled to an allocable deduction under section 691(c) for any estate tax paid on these rights. There is no dispute as to the taxable year 1964 because, under our disposition of the main issue, income received by the petitioners through the participating certificates is entitled to capital gains treatment.

We find that the amounts received by Baugh's estate in the taxable year 1963 constituted income in respect of a decedent within the ambit of section 691(a)(1). There was clearly a sale of the "Pinsetter" patents and other assets on February 4, 1947, in exchange for cash, stock in AMF, and a percentage of profits from the sale or lease of automatic pinsetting machines, and a subsequent liquidation of Pinsetter Co. in September and October 1954 by which its shareholders received participating certificates. The executor of Baugh's estate performed no activities with respect to the rights held under the participating certificates; and Baugh's right to these amounts as of the dates of sale and liquidation was contingent only upon the activities of the buyer, not the activities of Pinsetter Co., Baugh, or subsequent holders of the participating certificates. This is in sharp contrast to Rev. Rul. 60–227, 1960–1 C.B. 262, relied on by Baugh's estate where the decedent never *sold* the patent in question but merely granted to his licensees certain nonexclusive rights thereto. In that factual situation, "There was neither a transfer of all of the substantial rights to the patent nor a transfer of an undivided interest therein." Here, however, the amounts in question were not only attributable to Pinsetter Co.'s economic activity prior to the date of sale, as passed through to Baugh upon its liquidation in 1954, see *George W. Keck*, 49 T.C. 313 (1968), and *Davison's Estate* v. *United States*, 292 F. 2d 937 (Ct. Cl. 1961); but its activities and efforts gave rise to a right to receive such income. See *Trust Co. of Georgia* v. *Ross*, 392 F.2d 672 (C.A. 5, 1967). (Consequently, the amounts received by Baugh's estate are income in respect of a decedent.

Myrtle M. Oler Teichmann, deceased, claims that deficiencies against her for the years 1960 through 1964 were incorrectly determined because all amounts received were receipts of capital; and respondent's deficiency notices with respect to her were based on a determination that the receipts were ordinary income. Careful examination of the notices of deficiencies in docket Nos. 1317–66 and 1319–66 convinces us Myrtle was on notice that the deficiencies were based on the theory that it was income in respect of a decedent and that such income had the same character it had in the hands of the decedent. See sec. 691 (a)(3). Moreover, the wording of a notice of deficiency does not have to frame the issues precisely, and the Commissioner's method or reasoning in determining the deficiency is not the critical factor. Our responsibility is to redetermine the deficiency upon the basis of the

Commissioner's adjustment, not upon the reasoning assigned to the adjustment. Cf. *Brook* v. *Commissioner*, 360 F. 2d 1011 (C.A. 2, 1966) ; *Wilkes-Barre Carriage Co., Inc.*, 39 T.C. 839 (1963), affirmed per curiam 332 F. 2d 421 (C.A. 2, 1964) ; *Estate of Grace M. Scharf*, 38 T.C. 15 (1962), affd. 316 F. 2d 625 (C.A. 7, 1963) ; and *Edgar M. Carnrick*, 21 B.T.A. 12, 21 (1930). Therefore, we think the issue has been properly raised; and, as in the Estate of Harman E. Baugh, we hold that the amounts received through the Estate of Walter Oler must be treated as income in respect of a decedent.

Reviewed by the Court.

*Decisions in all dockets will be entered under Rule 50.*

---

SIMPSON, *J.*, dissenting : I must dissent from the opinion of the majority. If the proper test for deciding this case is whether the fair market value of the right to the future payments can be ascertained with reasonable certainty, I would have no quarrel with the decision, but I believe that a different test should be applied.

It is time for us to revisit *Burnet* v. *Logan*, 283 U.S. 404 (1931), and look carefully at the premises upon which that decision was based. In that case, the taxpayer was the seller of stock for which she received some cash and a right to future payments based on the amount of coal mined. The Court had to decide when the gain, if any, on this sale was to be reported. The Commissioner argued that a value of the right to future payments should be predicted, and that amount should be treated as received in the year of the sale. However, because of the uncertainty as to whether the seller would receive a return of her basis or how much gain, if any, she would realize, the Court concluded that the tax should not be imposed until she received payments in excess of her basis. For the years involved in the *Logan* case, capital gains were not treated differently than other types of income. Thus, the only question before the Court was one of timing—when should the income be reported. The Court merely held that when there is no necessity for predicting a value of a right to future payments, the transaction will not be closed and the gain will not be measured if the fair market value of the right cannot be ascertained with reasonable certainty.

In view of the intervening development of the different method for taxing capital gains, there is a need for determining a value in the situation before us. If the transaction is closed in 1954 and the value of the right to future payments is computed as of that time, such value, to the extent it exceeds the taxpayers' basis, will be treated as a capital gain; such value then becomes the taxpayers' basis in the right

to future payments, and if such payments turn out to be more than the anticipated value, the excess will be treated as ordinary income. Hence, the issue before us is more than one of merely determining when the income is to be reported. The decision also affects the amount to be treated as capital gains and the amount to be reported as ordinary income. Under the decision of the majority, the entire receipts are treated as capital gains; whereas if the 1954 value is determined, the excess is treated as ordinary income.

The issue before us is like the estate tax question in the *Logan* situation. Mrs. Logan inherited some of her rights, and for estate tax purposes, the value of those rights had been determined. Although that issue was not before the Court, it recognized that for estate tax purposes, there was a necessity for determining a value of the rights and implicitly approved of doing so when necessary. Just as there was a necessity to determine a value of the rights inherited by Mrs. Logan in order to determine the proper estate tax attributable to them, so there is a similar necessity for determining the value of the rights distributed to the shareholders in the situation before us. An attempt should be made to find the 1954 value of those rights, and that amount should be treated as a distribution at that time. Although any value so determined may be arguable, it is better to place some value on the rights than to treat the entire amounts received as capital gains. At least, placing a 1954 value on the rights achieves some allocation of the income between capital gains and ordinary income.

In the years that have passed since the *Logan* decision, there have been many cases decided on the basis of whether the rights to future income had an ascertainable fair market value. However, some courts have recognized that there was no capital gains tax for the years involved in the *Logan* decision (*John W. Chamberlin*, 32 T.C. 1098 (1959)) and that the existence of such a tax is a reason for finding a value of rights to future income. *Chamberlin* v. *Commissioner*, 286 F. 2d 850 (C.A. 7, 1960). Such reason may have encouraged other courts to conclude that the rights had an ascertainable value. Yet, rather than strain to find that the fair market value of rights to future income can be ascertained with reasonable certainty, it seems preferable to me to recognize that the *Logan* test is not to be applied in situations like the case before us. I would continue to apply *Logan* when only a question of timing is involved, or when the income is all of the same type, whether received now or in the future, but I would not apply it in the case before us.

RAUM and WITHEY, *JJ.*, agree with this dissenting opinion.