Scott McCORMAC and May McCormac

v.

The **UNITED STATES.**

No. 409–65.

United States Court of Claims.

April 17, 1970.

John H. Hall, Los Angeles, Cal., attorney of record, for plaintiffs. Dana Latham, Max L. Gillam, William A. Long, and Latham & Watkins, Los Angeles, Cal., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, S K E L T O N and NICHOLS, Judges.

## OPINION*

LARAMORE, Judge.

This is an action to recover a deficiency of Federal income taxes assessed and paid for the year 1961. The issues as presented by the parties involve the proper characterization of the cemetery stock transfer underlying this suit, and the tax treatment to be accorded the proceeds derived from that transaction.

The facts in this case are set forth at length in the findings of fact below. Here, they will be summarized only to the extent necessary to explain the basis for the conclusion reached that plaintiffs are not entitled to recover.

Plaintiff Scott McCormac ("McCormac")[1] is an attorney, admitted to the bar and practicing law in the State of California. In 1956, McCormac was associated with the firm of Forster and Gemmill in Los Angeles, of which firm Maytor McKinley ("McKinley") and certain business enterprises in which McKinley was interested were clients. McKinley, then president and major stockholder of Utter-McKinley Mortuaries, Inc. ("Utter-McKinley"), was experienced in both the mortuary and cemetery business.

In January 1956, McKinley went to Hawaii in connection with plans for establishing a cemetery on the Island of Oahu. At that time, Paul W. Trousdale ("Trousdale"), a man of varied and substantial business activities, was developing as a new community the entire 10,-000-acre Kaneohe Ranch ("Ranch") located on the Island of Oahu. The Ranch was being developed under lease from its principal owner, Harold Castle ("Castle"). Trousdale heard that McKinley had been looking for property on the Island of Oahu on which to establish a new cemetery, and he contacted McKinley for the purpose of arranging a meeting with Castle. In February 1956, McKinley began negotiations with Castle for the acquisition of certain land owned by the latter.

Financial considerations played an important role in the long-range planning

---

* We are indebted to Trial Commissioner Roald A. Hogenson for his findings of fact, which have been adopted in their near entirety, and for his recommended opinion, though we reach a contrary result.

1. Since May McCormac is a party to this suit only because she signed a joint income tax return with her husband, the singular term "plaintiff" when used hereinafter will refer only to Scott McCormac.

of the cemetery. It was McKinley's intention that a for-profit corporation be formed to develop and operate the cemetery for a period in excess of 3 years to avoid treatment as a collapsible corporation. Thereafter, McKinley and the other stockholders of the for-profit corporation would sell their shares to a newly formed nonprofit corporation which would continue the operation of the cemetery. It was further intended that the proceeds from the stock sale would be derived from the nonprofit corporation's operation of the cemetery, and would result in long-term capital gain treatment to the sellers.

The negotiations culminated in an agreement dated August 22, 1956, calling for the sale by Castle of an 80-acre tract of Ranch land, suitable for a cemetery site, to a corporation to be formed, Hawaiian Memorial Park, Ltd. ("Limited"). Limited's authorized capital stock was to be subscribed for as follows: 40 percent to Utter-McKinley; 30 percent to Trousdale; 15 percent to Herbert K. H. Lee ("Lee"), a local attorney; and 15 percent to the Kaneohe Ranch Group. The stated desire of the parties was that a cemetery be developed and operated on the site, under the direction and control of McKinley. To this end, the agreement recited the understanding of all parties that the success of the enterprise would depend largely upon the efforts, experience and judgment of McKinley. Utter-McKinley, Trousdale and Lee agreed to assign their stock to a 5-year voting trust with McKinley as trustee.[2] The agreement further provided that if Utter-McKinley (or McKinley) and Trousdale should find a purchaser for all of Limited's stock with no disproportionate advantage to the finders, all of the stockholders of Limited would sell their stock to such purchaser.

On July 22, 1957, Limited was incorporated under the laws of the then Territory of Hawaii as a for-profit cemetery corporation. Limited initially issued 600 shares, totaling $60,000 in par value, for $60,000 in cash, with 240 to Utter-McKinley, 165 to Trousdale, 90 to Lee, 30 to H. W. B. White ("White"), and 75 to Castle and the remaining members of the Kaneohe Ranch Group. On December 27, 1957, Utter-McKinley transferred 30 shares to Mason Letteau, and on July 22, 1958, Utter-McKinley transferred 180 shares to McKinley and its remaining 30 shares to McCormac. Letteau and plaintiff subsequently transferred their 60 shares to the voting trust described above.

On July 18, 1958, pursuant to the agreement of August 22, 1956, Limited purchased 80 acres of land ("the lands") from Castle for $58,640 in cash and a 10-year note for $581,536 at 3 percent interest, payable in specified installments. Limited had received on October 2, 1956, approval from the Board of Health for the establishment on the lands of a cemetery, subject to zoning. On February 7, 1957, the Board of Supervisors zoned the lands as a cemetery.

The original operating board of directors of Limited, elected on August 7, 1957, consisted of Lee, McKinley, Trousdale, White and Toshio Kondo ("Kondo"). Kondo, recommended by Lee, was a well-respected real estate man in the community, and also was coowner of a fleet of fishing boats. On May 15, 1958, the board was expanded to include Castle, Letteau, Fritz B. Herman ("Herman")[3] and Grover A. Godfrey, Jr. ("Godfrey").

Godfrey, a man with extensive cemetery experience, had been hired in 1957 as Limited's sales director and general manager, primarily to develop the cemetery. In February 1959, Godfrey and Limited executed an employment contract with a term of 7 years, under which Godfrey was permitted to purchase 30 newly issued Limited shares in exchange

---

2. Subsequently, Trousdale refused to so assign his stock.

3. Herman, recommended by McKinley, was an official with the Eastman Kodak Company, and past president of the Honolulu Chamber of Commerce.

for his non-interest-bearing promissory note for $40,000 due January 31, 1966. The employment contract further provided that in the event Godfrey wished to dispose of his shares, or ceased to be an employee of Limited before January 31, 1966, he was to offer the shares for sale to Limited at the same price at which he purchased them.

McKinley served as president of Limited from its inception to October 28, 1958, when Godfrey was elected president. McKinley was elected chairman of the board on January 23, 1959.

Limited began selling gravesites, primarily on a pre-need basis, in July 1958. Most of Limited's pre-need sales were payable in installments, usually over a period of 5 years, with down payments averaging approximately 10 percent in the first year of operation, and 5 to 7 percent thereafter. A staff of salesmen was maintained, ranging from 20 to 60 in number, who received commissions and bonuses on sales of gravesites. Although sales had originally been projected at $500,000 to $1,000,000 per year, the new cemetery was so successful that $500,000 of sales were made in the first 2 months of operation. Limited's cost per fully developed burial site averaged less than $21. Its average price per site during its 3 years of operation varied from $184 to $235 (excluding endowment care). A fixed amount of the revenue from each sale of a burial site was placed in an endowment fund for the perpetual care of the memorial park. During Limited's existence its gross sales totaled in excess of $7,000,000. The original cost and development cost of the lands were approximately $640,000 and $670,000, respectively.

McKinley believed that a going cemetery, being a public-service type of business, should be operated by a nonprofit corporation. Underlying this belief, however, and consistent with his original intentions, was his purpose that such a transfer to a nonprofit corporation be effected with resulting long-term capital gain treatment to the sellers. In 1961, almost 3 years from the inception of Limited's operation of the cemetery, McKinley initiated steps to effectuate his intention of transferring the cemetery to a nonprofit corporation. He asked Kondo and Herman to assist in recruiting others who were leading people in the community to form a nonprofit cemetery association. Kondo and Herman agreed to become incorporators and trustees of such an association, and on April 20, 1961, they both resigned as directors of Limited to avoid a conflict of interest in negotiating a contract between Limited's stockholders and the nonprofit cemetery association. They were never stockholders of Limited.

Hawaiian Memorial Park Cemetery Association ("Association") was organized on May 16, 1961, as a nonprofit cemetery corporation under the laws of the State of Hawaii. On November 9, 1961, Association was notified by the Hawaii Department of Taxation that Association's application for state tax exemption had been approved. The incorporators (and members) of Association listed in the charter, in addition to Herman and Kondo, were Marshall M. Goodsill ("Goodsill"), Joseph H. O'Donnell ("O'Donnell"), and Stanley M. Sabihon ("Sabihon"). The initial officers were Herman, chairman of the board; Godfrey, president; O'Donnell, vice president; and Kondo, secretary-treasurer. The initial board of trustees consisted of Herman, Kondo, O'Donnell, Sabihon, and George Chaplin ("Chaplin"). When Chaplin suddenly changed his mind and decided not to serve, Robert S. Craig ("Craig") and Randolph Crossley ("Crossley") were elected as additional trustees.

All of these trustees were successful and respected businessmen in the community. Of these trustees and officers of Association, none was ever a stockholder of Limited except Godfrey (Limited's sales manager) who held 30 shares. In addition to Herman, Kondo, and Godfrey, only one other of such persons had had previous association with Limited Goodsill as an attorney.

In March or April of 1961, McCormac was asked, as attorney for the stockholders of Limited, to prepare a draft of an agreement under which all of Limited's stockholders would sell their stock to Association. Sometime after May 12, 1961, the draft prepared by McCormac was furnished to Goodsill for his review as attorney for Association. At an organization meeting for Association during the early part of 1961, Goodsill had been retained to help form, and subsequently represent, Association. Pursuant to Goodsill's review of the draft, a number of minor changes in language were made, although there was no alteration of the price or payout terms.

Discussions were held in June 1961, attended variously by McKinley, McCormac, and trustees O'Donnell, Sabihon, Herman and Kondo, with respect to the general terms of the sale proposed in the draft. At one meeting, O'Donnell expressed his insistence on the independence of the trustees, and he sought clarification on whether the proposed purchase price, which was based on 40 percent of subsequent sales by Association, was a fair price. McKinley and McCormac assured O'Donnell of the trustees' independence and, with the aid of financial statements of Limited and sales projections for Association, explained the fairness of the price. In addition to the analysis of the financial statements, O'Donnell placed great reliance on the judgment of McKinley and McCormac, because of their extensive experience in the cemetery business. Similar meetings were held with other trustees in the latter part of June 1961, wherein the trustees were assured of their independence, and of the fairness of the proposed purchase price.

In May or June of 1961, McKinley presented Trousdale with the final form of the agreement of sale and sought his approval. Trousdale opposed the planned sale because he was concerned about loss of control of the cemetery, reliance on its operation by others for the payout of the purchase price, and the unclear position of the Internal Revenue Service as to the tax treatment of such transactions. Accordingly, it was agreed that if Trousdale could produce a bona fide offer of stock from a firm listed on the New York Stock Exchange with a value of $5,000,000, McKinley would agree to the acceptance of such an offer. When McKinley subsequently refused, however, to consider the fruits of Trousdale's efforts, Trousdale believed that no offer would be acceptable, and his efforts ceased. On June 20, 1961, Trousdale offered to have his shares redeemed by Limited for $1,000,000 payable over a 10-year period. The offer was rejected, and Trousdale was advised that he was the sole remaining dissenter. With McKinley's assurance that he would help the trustees in any way he could, should trouble arise, Trousdale then agreed to the proposed agreement of sale.

Two meetings were held on July 18, 1961, prior to the execution of the proposed agreement. Goodsill, as the attorney for Association, advised the trustees of their duties under law. Moreover, the trustees were once again assured, by the sellers, of their independence in the operation of the cemetery, and the fairness and feasibility of the purchase price.

Thus, on July 18, 1961, an agreement dated June 30, 1961, was executed between all of the stockholders of Limited as "sellers," and Association as "buyer." By its terms, the sellers sold their entire 630 shares in Limited to Association, in return for which Association agreed to liquidate Limited and to pay quarterly to the sellers 40 percent of Association's gross cash receipts from completed sales of cemetery land, merchandise and services, exclusive of amounts payable to the endowment care fund. A completed sale was defined as one in which the purchaser has made the final payment thereon. The agreement further provided that Association would use its best efforts to conscientiously operate the cemetery on a sound business basis; and that in the event of Association's breach of the agreement, during the first 5 years after the date of the agreement, 51 percent in interest of the sellers, and thereafter 25 percent in interest, could elect to ter-

minate, and to require Association to transfer its assets subject to its liabilities, pro rata to the then holders of the sellers' interests.

After the stock was transferred, Association caused Limited to be liquidated and dissolved on July 20, 1961. All of Limited's assets were transferred to Association, and all of Limited's obligations were assumed and guaranteed by Association effective July 18, 1961. Among the assets acquired by Association on the liquidation of Limited were accounts receivable from time-sales of burial sites by Limited in the face amount of $4,921,-459. On July 18, 1961, contracts of sale had been entered into and had either been fully consummated or were still outstanding with respect to approximately 31,000 gravesites, totaling approximately 24 acres, or 40.5 percent of the 76,593 total available gravesites. Also included among the assets acquired by Association were the remaining gravesites, of which about 45 percent had then been developed. Association began active operation of Hawaiian Memorial Park Cemetery on July 19, 1961.

When the trustees executed the agreement of July 18, 1961, they retained the organization which existed under Limited with little or no change in personnel. Godfrey's employment contract, which had 5 years remaining, was carried over and assumed by Association. Although the board of trustees was in control of Association, there was little doubt, in view of the experience and prosperous performance of Godfrey and the other members of Limited's staff, that such personnel would be retained by Association.

However, it was deemed desirable by the Limited stockholders and Association to limit the scope of Godfrey's subsequent duties to matters pertaining to sales. To this end, Association's bylaws and Godfrey's contract were amended to provide that the president (Godfrey) would have authority over sales, but that the executive vice president would have authority over financial and other administrative matters. Mr. Bernard H. Stuhlmacher

("Stuhlmacher") was elected, on July 18, 1961, to the newly created post of executive vice president. Stuhlmacher had been, for a short time, accountant and comptroller of Limited.

On the basis of their experience with Limited during the prior 3 years when Limited earned 50 percent of gross, McKinley and the other Limited stockholders believed that Association would be able to pay the 40 percent of gross and still be able to operate the cemetery. The trustees, too, were so persuaded, but recognized that the cemetery would have to be operated in an efficient and businesslike manner.

During the 2½ months following the July 18, 1961, transaction, McKinley had little contact with the trustees of Association. He did, however, correspond with Herman during this time, and made numerous suggestions and comments regarding the successful operation of the cemetery. Nevertheless, shortly after the July 18, 1961, transaction, the trustees experienced difficulty in operating the cemetery on a sound business basis. At the trustees' meeting of August 17, 1961, it was noted that sales were down, their competitors were underselling them, they had lost salesmen, and the 40 percent payments made it difficult to reduce prices. It was suggested that such matters be discussed with representatives of the former stockholders.

In the middle of September 1961, McKinley, upon learning of the trustees' difficulties, notified McCormac that the trustees desired their return to Hawaii to explain and discuss various matters. McCormac returned to Hawaii on September 28, 1961, and had informal discussions with some of the trustees regarding operational problems, and their doubts concerning ability to continue to make the 40 percent payments. Pursuant to the trustees' request, McCormac prepared, with the aid of a public accounting firm, financial projections showing the feasibility of the 40 percent payments, which projections were presented at a special trustees' meeting on October 4, 1961, attended by McKinley and McCor-

mac. After the presentation, McKinley and McCormac were elected members and trustees of Association, and McKinley was elected chairman of the board to succeed Herman, who had just resigned. The critical factor expressed by the trustees regarding the desirability of such elections was McKinley's and McCormac's knowledge of the cemetery business. At the same time, McKinley was fulfilling his earlier promise to Trousdale that should trouble arise, he would help in any way he could.

On October 19, 1961, Crossley resigned from the board. In addition to several personal and business reasons for his resignation, Crossley was of the view that McKinley's coming on the board, when he was still a creditor, was incompatible with the basis on which Crossley was serving; that McKinley's presence on the board could make future relations between the trustees and the former stockholders not at arm's length. Crossley's expressed reasons for resigning were advanced in a background of his admitted personal dislike of McKinley.

The board of trustees acted without interference from the former Limited stockholders, making its own decisions without seeking prior approval from such stockholders. Some of the former stockholders, especially McKinley and McCormac, made suggestions and recommendations as to the operation of the cemetery. Although not all of these suggestions and recommendations were carried out, the interests of the former shareholders and the interests of the trustees in regard to cemetery operation policies coincided so closely that it was not necessary for the trustees to make any significant decisions contrary to the interests of the former shareholders. Among the actions taken by the board that were independent actions (though not inconsistent with the interests of the former shareholders) were a decision to cut the prices at which double interment privileges would be offered, a decision raising prices on crypts, and a decision to retain Pacific Research Corporation as management consultants to make a survey of management problems.

On October 15, 1962, Association's executive committee resolved that no financial or administrative information be given to individual trustees or former stockholders without the express permission of Godfrey, Craig, or O'Donnell. At the trustees' meeting of July 26, 1962, on motion by O'Donnell, seconded by Craig, it had been resolved that financial statements would be issued only to trustees. These actions were taken because former stockholders had been seeking information regarding Association's financial condition directly from Association's staff, while the trustees felt such information should go through proper channels.

On April 17, 1962, Sabihon resigned from the board because of his inability to attend board meetings, and was replaced by Lee, who, as legal counsel to Association, was familiar with its affairs. Lee had been a stockholder of Limited and was one of the sellers under the pertinent contract. On April 25, 1963, McCormac recommended the election of Harry Y. Inase and Godfrey as trustees. O'Donnell opposed the suggestion and Inase and Godfrey were not elected. On July 23, 1964, Maytor H. McKinley, Jr., was elected to the board of trustees. On April 22, 1965, Craig resigned as trustee, although his resignation had been requested as early as 1963 by McCormac because Craig proposed handling certain pending legislation in a manner which McCormac deemed detrimental to Association.

On February 24, 1966, Wong was elected to the board of trustees. Wong was a stockholder-seller under the pertinent contract. On March 3, 1966, O'Donnell resigned in order to become an officer of a competing cemetery, Valley of the Temples. The stated reason for the move was the betterment of O'Donnell and the O'Donnell family. Finally, on February 2, 1967, A. William Barlow and Edward J. Suess were elected to the board of

trustees.[4] Neither had had any association or connection with Limited.

After submitting a bid in competition with other cemeteries, Association ob-

4. The following tabulation summarizes the membership of the board of trustees of Association, as it varied from July 18, 1961, through February 2, 1967, and lists the names of the incorporators of Association on May 16, 1961. By appropriate symbols, the tabulation shows who of those persons were stockholders (S), directors (D), or officers (O) of Limited at times prior to its liquidation.

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5/16/61 | Goodsill, Atty for Ltd. | Herman, Chairman (D) | Kondo (D) | O'Donnell | Sabihon | | Crossley | |
| 7/18/61 | | Herman, Chairman (D) | Kondo (D) | O'Donnell | Sabihon | Craig | Crossley | |
| 10/4/61 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Sabihon | Craig | Crossley | Plaintiff, Atty. for Ltd. (S)(D) |
| 10/19/61 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Sabihon | Craig | | Plaintiff, Atty. for Ltd. (S)(D) |
| 4/17/62 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Lee (S)(D)(O) | Craig | | Plaintiff, Atty. for Ltd. (S)(D) |
| 7/23/64 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Lee (S)(D)(O) | Craig | McKinley, Jr. (S) | Plaintiff, Atty. for Ltd. (S)(D) |
| 4/22/65 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Lee (S)(D)(O) | | McKinley, Jr. (S) | Plaintiff, Atty. for Ltd. (S)(D) |
| 2/24/66 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | O'Donnell | Lee (S)(D)(O) | Wong (S)(D)(O) | McKinley, Jr. (S) | Plaintiff, Atty. for Ltd. (S)(D) |
| 3/3/66 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | | Lee (S)(D)(O) | Wong (S)(D)(O) | McKinley, Jr. (S) | Plaintiff, Atty. for Ltd. (S)(D) |
| 2/2/67 | McKinley, Chairman (S)(D)(O) | Herman (D) | Kondo (D) | Barlow & Suess | Lee (S)(D)(O) | Wong (S)(D)(O) | McKinley, Jr. (S) | Plaintiff, Atty. for Ltd. (S)(D) |

[A16901]

tained a 10-year contract with the city and county of Honolulu to provide burial space for indigents to be paid for out of public funds. Association otherwise provided space in time of need for those unable to pay the purchase price, and on no occasion was any person turned away because of lack of funds.

In the cemetery industry, nonprofit cemetery corporations generally have business policies similar to those of for-profit cemetery corporations with respect to prices, management methods, and sales methods. Association was operated by the trustees in a manner generally typical of the operation in the cemetery industry of nonprofit cemetery corporations.

After its acquisition of the cemetery, as mentioned earlier, Association encountered financial difficulties. For the years 1962–1965, it had an excess of expenditures over revenues of approximately $1,100,000 after payments of $1,331,-

The following tabulation summarizes the names of officers of Association, as they varied from May 16, 1961, through February 2, 1967, and by appropriate letter symbols, shows who of those officers (S), directors (D), or officers (O) of Limited at times prior to its liquidation.

| Date | Chairman of the Board | President | Vice-President | | Secretary-Treasurer |
|---|---|---|---|---|---|
| 5/16/61 | Herman (D) | Godfrey (S)(D)(O) | O'Donnell | | Kondo (D) |
| 7/18/61 | Herman (D) | Godfrey (S)(D)(O). | O'Donnell | | Kondo (D) |
| 10/4/61 | McKinley (S)(D)(O) | Godfrey (S)(D)(O) (resigned 2/10/65) | O'Donnell | *Executive V.P. until office eliminated 5/17/62:* Stuhlmacher, Comptroller of Ltd. | Kondo (D) |
| 4/22/65 | McKinley (S)(D)(O) | Lee (S)(D)(O) | Plaintiff (S)(D) Atty. for Ltd. | *V.P. for Perpetual Care* O'Donnell (resigned 3/3/66) *V.P. & Director of Sales* Carter (resigned 9/1/65) | Kondo (D) |

[A1691]

511 to former stockholders.[5] The decrease in net sales and profits during those years was due largely to increased competition and inefficient operation.

5. Statements of revenue and expenses of Association for its fiscal years ended June 30, 1962, through June 30, 1966 (audited), and for the 9-month period ended March 31, 1967 (unaudited), are summarized in the following table:

| | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 (9 Mos.) |
|---|---:|---:|---:|---:|---:|---:|
| **Revenue** | | | | | | |
| Gross Sales | 1,334,063 | 996,361 | 1,284,998 | 1,472,667 | 1,749,711 | 1,294,880 |
| Less Cancellations | 83,524 | 106,510 | 476,056 | 1,158,662 | 465,272 | 250,236 |
| Net Sales | 1,250,539 | 889,851 | 788,942 | 314,005 | 1,284,439 | 1,044,644 |
| Cost of Sales | 620,307 | 428,894 | 407,488 | 168,369 | 256,579 | 316,526 |
| Gross Profit on Sales | 630,232 | 460,957 | 381,454 | 145,636 | 1,027,860 | 728,118 |
| Forfeited Payments on Cancelled Installment contracts | 2,000 | 2,720 | 25,458 | 81,384 | 51,584 | 93,882 |
| Fees and miscellaneous income | 27,326 | 23,470 | 26,990 | 44,279 | 90,773 | |
| Gross Profit | 659,558 | 487,147 | 433,902 | 271,299 | 1,170,217 | 822,000 |
| **Operating Expenses** | | | | | | |
| Selling Expenses | 316,422 | 289,954 | 320,307 | 280,002 | 402,642 | 271,026 |
| Administrative Expenses | 293,622 | 255,057 | 230,303 | 288,095 | 253,940 | 184,556 |
| Park Maintenance Expenses | 105,560 | 165,951 | 115,938 | 115,364 | 96,116 | 68,478 |
| | 715,604 | 710,962 | 666,548 | 683,461 | 752,698 | 524,060 |
| Excess of Operating Revenue over Operating Expenses (Deficit) | (56,046) | (223,815) | (232,646) | (412,162) | 417,519 | 297,940 |
| **Other Deductions** | | | | | | |
| Interest | 48,824 | 20,974 | 2,570 | 13,849 | 14,213 | 877 |
| Loss on sale of fixed assets | | | | 1,070 | 793 | |
| Excess of Revenue over Expenses (Deficit) | (104,870) | (244,789) | (235,216) | (427,081) | 402,513 | 297,063 |
| Special Item | | | | 83,323 | | |
| | | | | (510,404) | | |

[A16921]

Through 1965 the financial statements include as part of the cost of goods sold the payments due the former stockholders under the contract of July 18, 1961;

The primary factor was the creation of two large new park-type cemeteries by investors attracted by Limited's record of high profits. The inefficient operation stemmed, in part, from Godfrey's engagement in numerous outside ventures which detracted from his direction of the cemetery's sales efforts, and from abusive sales practices which grew up among Association's salesmen.

On February 10, 1965, Godfrey resigned as president of Association at the request of the trustees. A check was given to him covering the remaining salary due under his management contract. Such contract provided that Godfrey was to turn over his proportionate share of the pertinent contract to Association in return for his original investment in Limited stock. The board and Godfrey, however, amended the management contract to enable McKinley to acquire Godfrey's interest, and McKinley acquired it for $19,000. After Godfrey's resignation his assistant, John Powers, also left and went to work for a competing cemetery, taking with him about 80 percent of Association's sales force.

On April 22, 1965, the board of trustees, on McKinley's recommendation, elected Lee president and general manager to be in full charge of the business. Shortly thereafter, on July 22, 1965, the board, in recognition of his many services dating back to July 22, 1957, voted McKinley retroactive compensation at the rate of $1,000 per month for the period from July 22, 1957, through December 31, 1965, and future compensation at the same rate.

For the first full fiscal year of Lee's administration (the fiscal year ended June 30, 1966), largely as a result of Lee's sound management, higher down payments were received, bonuses were discontinued, many expenses were eliminated, cancellations greatly declined, and sales volume rose to $1,749,711. Moreover, gross sales for the following 9 months, ending March 31, 1967, were $1,294,880.

In 1965, the income tax status of Association was being called into question by agents of the Internal Revenue Service. Association's trustees determined on February 10, 1965, to suspend further contract payments until its bank debt was reduced and there was a resolution of Association's tax status. The payments made by Association to the former stockholders of Limited or their assignees pursuant to the July 18, 1961, agreement up to October 15, 1965, totaled $1,331,511.30. Included in the payments of $73,615.50 made in 1961 was $3,505.50 paid to McCormac. These payments were treated on Association's books and records and on its tax returns as part of Association's cost of goods sold and as basis on accounts receivable as of July 18, 1961, a procedure questioned by the Internal Revenue Service in 1965.

On October 15, 1965, the agreement of July 18, 1961, was amended to provide that the consideration to be paid by Association to the sellers would be the fixed sum of $6,000,000, against which payments previously made would be applied. The stated reason for the amendment was that certain income tax problems had arisen, making it impracticable for Association to avoid a default. Subject to the foregoing, the amendment also prescribed a minimum percentage on payments when they resumed, and it reduced the percentage of sellers' interests necessary for termination in the event of a breach by Association.

■ In their 1961 federal income tax return, plaintiffs reported as long-term capital gain the excess of the $3,505.50 payment received from Association over the reported $3,000 cost basis of McCormac's stock in Limited. On or about April 9, 1965, plaintiffs received a notice of deficiency from the District Director for the taxable year ending December 31, 1961, which letter asserted a deficiency

but thereafter little or no deduction was taken for payments due the stockholders. The special item for 1965 in the sum of $83,323 represents an accrual of management fee voted McKinley at the rate of $1,000 per month from July 22, 1957.

of $1,175.54. In the deficiency letter, the District Director treated the entire proceeds from Association to plaintiff as ordinary income. On May 7, 1965, McCormac paid to the District Director the sum of $1,175.54, plus interest in the amount of $215.85; and he filed a claim for refund on the ground that the $3,505.50 in question constituted proceeds from the sale or exchange of a capital asset held for over 6 months and not ordinary income. The claim for refund has not been paid.

Plaintiffs contend that the July 18, 1961 transfer of Limited stock to Association constituted a bona fide sale which must be treated as an "open" transaction for tax purposes. Accordingly, plaintiffs conclude that they were required to report only the proceeds received in the year of sale, and that they were entitled to treat such proceeds first as return of capital, and then as capital gain. Defendant responds that the transfer in question was not a bona fide sale, but rather an exchange of Limited stock for an equity interest in Association, and that the payments received by plaintiffs were corporate distributions attributable to such equity interest.

We find it unnecessary to reach the bona fide sale-equity exchange issue as framed by the parties in disposing of plaintiffs' refund claim. Assuming *arguendo* that, as plaintiffs contend, the stock transfer in question was a bona fide sale, that sale, in our view, constituted a "closed" transaction whereby the transactional gain in its entirety was realized, recognized and returnable in the year of sale. Consequently, even an analysis which assumes the occurrence of a sale reveals that plaintiffs did not overpay their taxes for 1961, and are not entitled to recover.[6]

Section 1001(a) of the Internal Revenue Code of 1954 [7] states the general rule for the determination of the amount of gain from the sale or other disposition of property as follows:

The gain from the sale or other disposition of property shall be the excess of the *amount realized* therefrom over the adjusted basis [of the property sold or otherwise disposed of] * * *. [Emphasis supplied.]

Section 1001(b) explains, with particular pertinence to the instant case, that:

The *amount realized* from the sale or other disposition of property shall be the sum of any money received plus the *fair market value of the property* (other than money) *received.* * * * [Emphasis supplied.]

█ Consonant with above statutory rules, it is well settled that the proper tax treatment of a transaction as open or closed depends upon whether that which the transferor receives on his side of the transaction is property with an ascertainable fair market value. *See*, Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L. Ed. 1143 (1931); Marsack's Estate v. Commissioner of Internal Revenue, 288 F.2d 533 (7th Cir. 1961); Stephen H. Dorsey, 49 T.C. 606 (1968). And, in turn, whether a particular contract containing rights contingent on future income can be valued for income tax purposes is a question of fact, with the burden of proof as to insusceptibility to valuation resting upon the taxpayer. *See*, Marsack's Estate v. Commissioner of Internal Revenue, *supra*; Stephen H. Dorsey, *supra*; Chamberlin v. Commissioner of Internal Revenue, 32 T.C. 1098 (1959), aff'd, 286 F.2d 850 (7th Cir. 1960).

Plaintiffs assert that albeit their expert valuation witness established a fair

---

6. The result of the sale-assumption and closed-transaction treatment is that plaintiffs realized approximately $248,430 of long-term capital gain (*i. e.*, the value of plaintiffs' proportionate share of the contract rights received by the sellers less plaintiffs' basis in the stock which

they transferred) in the year of transfer. It is readily apparent from this analysis that plaintiffs did not overpay their taxes for 1961.

7. All citations to Code sections hereinafter are in reference to the Internal Revenue Code of 1954.

market value for the contract rights received by the Limited stockholders to show reasonableness of price in furtherance of plaintiffs' argument that a sale occurred, such value "necessarily involved various assumptions, entirely calculated valuations in the absence of a market for the type of asset being evaluated, * * * various difficult predictions regarding the future" and did not constitute an ascertainable fair market value for the purpose of treatment as a closed transaction. (Plaintiffs' brief, p. 88). As will be seen, in the context of the instant case, plaintiffs' assertion is unpersuasive.

Plaintiffs rely principally upon the landmark case of Burnet v. Logan, *supra,* wherein the taxpayer sold stock in a steel company owning rights in iron ore to another steel company for a consideration consisting of cash plus an agreement to pay to taxpayer 60 cents per ton of ore it received under the acquired rights. In holding that the taxpayer's interest in the agreement could not fairly be valued[8] and, therefore, the sale was to be treated as an open transaction, the Supreme Court stated at 283 U.S. page 413, 51 S.Ct. page 552:

> * * * The consideration for the sale was $2,200,000.00 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. * * *

Plaintiffs' reliance upon the above-described decision does not advance their cause, but rather reaffirms the rule that where property received in a sales transaction has, as a factual matter, no ascertainable fair market value, the transaction is open. The Supreme Court in the *Logan* case did not decide, as we understand it and as we believe it to be commonly understood, that contracts for indefinite payments generally have no ascertainable value, but did decide, as indicated by the excerpt set out above, that the many uncertainties *there* involved prevented fair valuation. *See also,* Gersten v. Commissioner of Internal Revenue, 267 F.2d 195 (9th Cir. 1959); Chamberlin v. Commissioner of Internal Revenue, 286 F.2d 850 (7th Cir. 1960), aff'g 32 T.C. 1098 (1959).

Indeed, for a number of years, and prior to the year in suit, it has been the stated position of the Internal Revenue Service that:

> Contracts and claims to receive indefinite amounts, such as those received in exchange for stock in liquidation of a corporation, must be valued for Federal income tax purposes *except in rare and extraordinary cases.* [Emphasis supplied.] Rev.Rul. 58–402, 1958–2 C.B. 15.

The practical effect of this ruling was to reaffirm the Service's position contained in all the income tax regulations issued from the 1928 Revenue Act through the 1954 Code,[9] and to limit to their particular facts certain court decisions which held that contingent rights to future income did not have ascertainable values for tax purposes.[10]

We find little in the record before us to indicate that plaintiffs have successfully discharged their burden of proof with respect to the insusceptibility of the subject contract to valuation and thereby

---

8. The court explicitly acknowledged that the right possessed by the taxpayer's mother under the agreement to share in the possible future proceeds *had* been valued for estate tax purposes and so taxed upon transfer. The distinction was justified by the court on the ground that for estate tax purposes, "[s]ome valuation—speculative or otherwise—was necessary to close the estate." 283 U.S. at 413, 51 S.Ct. at 553.

9. Treas.Reg. 74, Article 561 (1928 Act); Treas.Reg. 77, Article 561 (1932 Act); Treas.Reg. 86, Article 111–1 (1934 Act); Treas.Reg. 101, Article 111–1 (1938 Act); Treas.Reg. 103, § 19.111–1, Treas.Reg. 111, § 29.111–1 and Treas.Reg. 118, § 39.111–1(a) (1939 Code); and Treas.Reg. § 1.1001–1(a) (1954 Code).

10. *See, e. g.,* Burnet v. Logan, *supra;* Robinette v. Helvering, 318 U.S. 184, 63

brought themselves within the open-transaction exception to the general rule. On the contrary, the record conclusively reveals, as a result of *plaintiffs'* diligent efforts, that the contract in question did not constitute a "rare or extraordinary case," and indeed had an ascertainable fair market value. Furthermore, this value which was so carefully established by plaintiffs' expert witness, and accepted herein as a finding of fact,[11] was based *not* on a comparison of prices in the market for the type of asset (contract) being valued, but rather on the alternative annuity method of capitalization whereby the present worth of future income that could reasonably be expected under the contract is calculated. And, it is precisely the value *established* by the latter method in this suit which apparently *could not be established* on the facts of the *Logan* case, and resulted in the transaction there being held open. This distinction is, in our view, dispositive.

In accordance with the above, we hold that there was no overpayment of taxes for 1961. Plaintiffs, therefore, are not entitled to recover in this suit, and their petition is dismissed.

S.Ct. 540, 87 L.Ed. 700 (1943); Commissioner of Internal Revenue v. Edwards Drilling Co., 95 F.2d 719 (5th Cir. 1938), aff'g 35 B.T.A. 341 (1937), acquiesced in, 1939–1 Cum.Bull. 11; Thomas J. Brant, 13 T.C. 712 (1949), acquiesced in, 1950–1 Cum.Bull. 1. *See* *also,* Alexander, Valuation of Intangibles, 20 N.Y.U. Tax Inst. 567, 570 (1962).

11. *See* findings 49 and 50, *infra.*