427 F.2d 661
 O. B. M., INC., Burton O'Brien, Gerard M. McAllister, Anthony J. McAllister, James P. McAllister, Roderick H. McAllister and Charles D. McAllister, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 618.
 Docket 34134.
 United States Court of Appeals, Second Circuit.
 Argued April 9, 1970.
 Decided May 28, 1970.
 
 Bernard J. Long, Jr., Washington, D. C. (Dow, Lohnes & Albertson, Bernard J. Long, and Richard L. Braunstein, Washington, D. C., on the brief), for petitioners.
 Issie L. Jenkins, Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Gilbert E. Andrews, and Lee A. Jackson, Dept. of Justice, Washington, D. C., on the brief), for respondent.
 Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 O.B.M., Inc., and its six individual shareholders appeal from decisions of the Tax Court, 52 T.C. 619 (1969), upholding the Commissioner of Internal Revenue's determination of their liability for deficiencies based on the corporation's failure to comply with the 12-month liquidation procedure of § 337(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 337(a). We reverse.
 
 
 2
 O.B.M., Inc., is the current name of a New York corporation through which various members of the O'Brien and McAllister families have engaged in marine dredging and transportation operations since 1906. In 1958, it sold substantially all its operating assets to Tidewater Dredging Corp., a firm with which some members of the two families are also involved. In return, O.B.M. received 50 per cent of both the Tidewater common and preferred stock.
 
 
 3
 On or about June 19, 1961, the stockholders of Tidewater voted to sell all its physical assets to Great Lakes Dredge and Dock Co., an unrelated Chicago firm, for $2,150,000. On June 23, both the Tidewater stockholders and those of its 50 per cent parent O.B.M. adopted plans of complete liquidation calling for distribution within 12 months of all assets not necessary to meet claims. Gerard M. McAllister, an attorney who was a stockholder and an officer of both firms, was appointed trustee in liquidation of the two companies. Louis J. Riso, O.B. M.'s treasurer and Tidewater's financial vice-president, was designated to handle the details under both plans.
 
 
 4
 Tidewater completed its planned distributions on February 28, 1962, the day on which its 1961-62 fiscal year ended. After receiving the proceeds of the sale of its assets to Great Lakes and after satisfying various creditors, Tidewater distributed a total of $834,060 to O.B.M. and other sums to the remaining owners. None of Tidewater's shareholders surrendered his stock to the corporation as a result of these liquidating distributions.
 
 
 5
 At the close of this fiscal year, Tidewater's books showed assets of $128,653, largely in the form of accounts receivable, and itemized liabilities of only $12,837. But the annual report explained that this balance sheet, indicating a remaining stockholders' equity of $115,816, did not reflect three additional contingent liabilities: (1) retroactive workmen's compensation premiums of approximately $51,000; (2) estimated liability to the owner of the vessel Judi Bob for $20,000 damages above the $500 shown for this claim on the books; and (3) possible liability in connection with unaudited federal, state, and local tax returns.
 
 
 6
 By the end of its own 12-month liquidation period in June of 1962, the parent firm, O.B.M., made cash distributions totaling $1,127,000 to its six shareholders: Burton O'Brien, Gerard M. McAllister, Anthony J. McAllister, James P. McAllister, Roderick H. McAllister, and Charles D. McAllister. It also distributed to them its shares in Mersick Industries, Inc., an apparently unrelated company. On June 23, 1962, O.B.M.'s books showed remaining ascertained assets of $5,099 and liabilities of approximately $8,000. The largest component of the latter sum was a $4,416.61 tax judgment, with interest then calculated at $1,300, for which O.B.M. was liable to the City of New York, and which had arisen from a joint venture in which O.B.M. had participated. In addition, several of O.B.M.'s federal, state, and local tax returns also remained unaudited.
 
 
 7
 Along with its ascertained assets and these assorted liabilities, O.B.M. also retained three other asset items: (1) an inoperative tugboat, the DuBois II, with an estimated scrap value of $3,000-$5,000; (2) its interest in a lawsuit against the City of New York arising out of a pier demolition contract performed by the aforementioned joint venture; and (3) its half of the uncancelled Tidewater stock.
 
 
 8
 Both companies filed tax returns indicating no corporate-level income as a result of the disposition of their assets, in what they assumed to be compliance with § 337(a).[1]
 
 
 9
 As a result of the reconciling of assorted contingent claims, however, both Tidewater and O.B.M. distributed additional sums to their respective shareholders after the close of the specified 12-month liquidation period. During 1963, federal tax authorities did in fact assert the anticipated deficiency against the operating company, Tidewater, in the sum of approximately $30,000 plus interest; but this claim was settled for an unspecified amount during that year. In addition, Tidewater settled its workmen's compensation liability in 1963 for less than the previously allocated $51,000. In 1964, it satisfied its damage liability to the owner of the Judi Bob for $4,900 instead of the expected $20,000. As a result, it made three post-1962 distributions to its half-owner O.B.M., totaling $36,454. Still further, O.B.M. itself realized a total of $6,000 (including an unforeseen forfeited purchase deposit of $2,000) on its sale of the tug DuBois II for scrap; and it also settled its joint venture lawsuit against New York City in exchange for a compromise of the City's tax judgment and a net cash sum of $12,859.83. As a result of these five separate turns of good fortune benefiting Tidewater and itself, taxpayer O.B. M. was able to distribute an additional $47,000 to its six shareholders between 1962 and 1966.
 
 
 10
 In summary, the $2 million dredging and towing business with which both firms were involved was substantially wound up over a period of several years; but in the process, about 4 per cent of O.B.M.'s total distributions were made after the 12-month period specified in its liquidation plan. For this reason, the Commissioner determined deficiencies in O.B.M.'s taxes of $63,594.73 plus interest for the years 1961-1963. He also determined that each of the firm's six shareholders is liable as a transferee for this total amount pursuant to 26 U.S.C. § 6901.
 
 
 11
 Congress enacted § 337(a) to allow the owners of liquidating corporations to obviate double capital gains taxation otherwise imposed by a tax on the corporation when it sells capital assets and another on the stockholders when the proceeds are distributed. See West Street-Erie Blvd. Corp. v. United States, 411 F.2d 738, 740-741 (2 Cir. 1969). Consequently, a corporation which distributes all its assets other than those retained to meet claims within a 12-month period after its adoption of a liquidation plan may relieve its owners of concern with some of the formalities which previously governed the tax consequences of such a transaction. See C. I. R. v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950).
 
 
 12
 The statute authorizes a liquidating corporation to retain only those assets needed to meet claims outstanding after the close of the 12-month period, without approving retention of assets, large or small, for any other purpose. But it has never been suggested that O.B.M. or its shareholders caused the corporation to retain the $47,000 in question for any other specific use besides meeting claims. In addition, it appears that the individual shareholders' tax consequences were not significantly affected by the retention and delayed distribution, so that there was no tax motive for a conscious shaping of the liquidation along these lines.[2] The Commissioner claims only that the corporate taxpayer did not retain certain assets to meet claims, as it was permitted to do by § 337(a), with the requisite degree of care and formality.
 
 
 13
 Specifically, the Commissioner contends that O.B.M. violated Treasury Regulation § 1.337-1, which requires that:
 
 
 14
 "Any assets retained after the expiration of the 12-month period for the payment of claims (including unascertained or contingent liabilities or expenses) must be specifically set apart for that purpose and must be reasonable in amount in relation to the items involved."
 
 
 15
 He argues that O.B.M. improperly retained two assets without setting them apart to meet claims: its interest in the joint venture lawsuit, and its equity interest in its simultaneously-liquidated subsidiary, Tidewater. The appellants, on the other hand, claim that O.B.M. retained its interest in the lawsuit to use as a set-off against a specific liability, the judgment which it owed to the defendant in that same suit, New York City; and they assert that the Tidewater stock, although not itself set apart by O.B.M. to satisfy some claim, was thought worthless because all of the equity which it represented had been set aside previously by Tidewater to meet its own specific but unascertained liabilities.
 
 
 16
 The Commissioner's argument includes both a formal and an evaluative branch: he maintains that O.B.M. neither "set apart" the lawsuit and Tidewater stock by arranging to segregate them in an adequate manner nor reached a good faith decision to attempt such segregation.[3] The Tax Court did not rely on either of these approaches, but instead concluded that O.B.M. had simply failed to exercise "any serious judgment" whatsoever with respect to the retention of assets to meet claims. This holding, which avoided the issues as framed by the parties, was based on findings which are clearly erroneous.
 
 
 17
 The lawsuit, begun by the joint venture in 1953, alleged contract damages of $250,000. Despite its ambitious allegations, however, two law firms advised that they considered the suit to be without merit and refused to continue it. Another attorney finally agreed to pursue the litigation, on a contingent fee basis, but only as a courtesy to a client. Five years later, in 1958, the City offered to settle for $15,000; but this offer was rejected, and counsel continued to ask for a settlement of $70,000 instead. Between this date and the liquidation four years later, however, one of the joint venturers' two key witnesses became extremely ill and infirm; and the other left the New York City area on other engineering jobs and might have been unavailable. Although depositions had been taken from both, the attorney in charge of the suit for O.B.M. testified that he considered the negotiating value of the claim diminished. Consequently, they stated, Gerard McAllister and his subordinate Riso decided at liquidation that at best the claim would only approximately offset the $5,700 judgment and interest which O.B.M. owed the City at that time.
 
 
 18
 The rather dormant suit reached the pre-trial conference stage in October of 1962, at which point the court and parties conducted what was apparently the first review of settlement prospects in several years. Negotiations continued during 1963 and finally led to the execution of a settlement agreement on February 10, 1964. O.B.M. received not only a release from its judgment obligation to the City, but a gross sum of $25,000. Slightly more than half of this amount — $12,859.83 — was net gain to O.B.M.
 
 
 19
 The Tax Court found from these facts that the lawsuit had a "cash value" of $10,500 to O.B.M. on June 23, 1962, the closing date of its liquidation period.[4] Without regard to the reasonableness of the difference between this figure and the offset value placed on the claim by O.B.M.'s trustee, however, the Tax Court concluded that the corporation could not have retained the asset to meet claims. It reached this result on the basis of a finding that McAllister was totally unaware of the City's 1958 "open" offer to settle for $15,000[5] and did not consult the attorney handling the claim about its value during liquidation. This finding was clearly erroneous: the taxpayers' exhibits included a copy of a 1958 letter signed by Gerard McAllister acknowledging the existence of this offer, and the attorney's testimony cannot be read to suggest that McAllister failed to consult him about the matter thereafter.[6]
 
 
 20
 In fact, the lawsuit was used in large part precisely for the purpose for which it was preserved, post liquidation, as a set-off against the City's outstanding judgment. It is difficult to imagine how O.B.M. might have set a portion of the claim "apart" formally for this purpose and in addition distributed the right to any excess settlement amount to its shareholders without risking further diminution of the claim's negotiating value, which is a problem the Tax Court did not reach. In addition, the O.B.M. trustee did not fail to demonstrate that "good faith" exercise of judgment required by the Commissioner's regulations when under the circumstances he concluded that the possibility of an excess settlement in the form of a cash sum could not be termed an additional asset to be considered separately and distributed.
 
 
 21
 The Tax Court also held that the O.B. M. trustee's failure to distribute the Tidewater stock was improper because McAllister and Riso made no "serious effort" to anticipate the amount of the contingent claims outstanding against O. B.M. Without considering the propriety of Tidewater's own retention of assets to meet claims, it concluded that the O. B.M. trustee should have realized that there was a possibility that the stock was not totally worthless and might have some value to its owners. The court then rejected the taxpayers' alternative contention that O.B.M. retained the Tidewater stock in order to apply any such residual value against O.B.M.'s own contingent liabilities.
 
 
 22
 There is ample evidence to support the Tax Court's conclusion that the trustee did not allocate residual Tidewater equity to the satisfaction of O.B.M.'s own liabilities. But the absence of any effort to make an allocation cannot justify the court's alternative holding that the same trustee, simultaneously supervising the liquidation of Tidewater, failed to exercise "any serious judgment" about O.B.M.'s compliance with § 337(a) when he concluded that claims against the subsidiary would exhaust the equity and make its stock worthless to O.B.M. The court below made this latter finding after expressly declining to consider the success of the subsidiary's attempt to comply with § 337(a), a vital factor without evaluation of which the holding stands unsupported by the facts and is erroneous.
 
 
 23
 In the case of Tidewater's liquidation, it is clear that a "serious effort" was made to ascertain specfic contingent liabilities and retain only the assets thought necessary to meet them. The subsidiary's assets needed for each of these claims were designated and thereby "set apart" in its 1961-62 pre-liquidation annual report.[7] Furthermore, the judgment employed in making these determinations concerning the size of outstanding claims satisfied the Commissioner's "good faith" requirement. The trustee fixed the anticipated amount of each of the three categories of contingent claims conservatively high, but not disproportionately so.[8] A "good faith" decision that assets are needed to meet claims must be one which is based on a consideration of each contingent claim, but it should also be one which reasonably avoids the risk that underestimated claims will cause a liquidating corporation later to be thrown into bankruptcy. Cf. Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66, 90 (E.D.N.Y.1969).
 
 
 24
 In view of the trustee's good faith determination that outstanding claims would exhaust the Tidewater equity, it was not necessary that he cause O.B.M.'s share of it to be either "set apart" further or distributed. Although he might have taken such an additional step[9] to provide for the possibility that a conservative estimate of outstanding claims could ultimately give rise to subsequent distributions, the evidence supporting his determination that such a contingency was unlikely was sufficient to relieve him of any requirement that he do so in the circumstances of this case.
 
 
 25
 The decisions of the Tax Court are reversed.
 
 
 
 Notes:
 
 
 [1]
 The text of the statute is:
 "Sec. 337. Gain or Loss on Sales or Exchanges in Connection with Certain Liquidations.
 (a) General Rule. — If —
 (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
 (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."
 
 
 [2]
 Had O.B.M. distributed what was presumed to be worthless Tidewater stock, the individual taxpayers would not have been required to report it; and the subsequent distributions would have been reported as capital gains, precisely as they in fact were. See Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931); C.I.R. v. Carter, 170 F.2d 911 (2 Cir. 1948)
 
 
 [3]
 Treas.Reg. § 1.337-2, which refers to arrangements by which an amount ofcash may be set aside and retained by a liquidating corporation for the payment of unascertained or contingent liabilities, is the apparent textual source of the Commissioner's "good faith" standard for the retention of any assets.
 
 
 [4]
 The court did not specify whether this "cash value," calculated as the remainder of a $15,000 settlement after expenses, referred to value in addition to the potential compromise of the City's tax judgment, or to the value of the claim if it had been settled for cash alone on that date
 
 
 [5]
 Although an assistant New York City corporation counsel stated that he never formally withdrew the $15,000 offer made in 1958, the attorney in charge of the claim for O.B.M. testified that he did not consider the offer an open one. Instead, he said that the City never formally made or withdrew offers in suits of this type. He characterized the $15,000 offer as only what the City would have paid at a particular moment for the discontinuance of a suit which it thereafter maintained to be wholly without either merit or negotiating value
 
 
 [6]
 O.B.M.'s attorney was asked, on redirect:
 "Q. Mr. Foreman, on or about — or during the year 1962, up to June of 1962, particularly between the period June '61 to June '62, did you at any time ever express any optimism for a settlement of this case with the clients? A. That, I am sure I did not.
 "Q. Now, what was the position of the City with respect to liability in this case, throughout that period of time? A. The position of the City of New York was that there was no liability in this case.
 "Q. And did they give you reasons for that? A. Yes. One occasion when I had a meeting with Mr. Morgan Lipton of the Corporation Counsel's office, in discussing the case and when Morgan Lipton told me that there was nothing in this case for us and let's go ahead with something that's more profitable, he showed me the confidential report that had ben prepared [by an outside expert] * * * At this time Morgan Lipton says, in view of this, I can't offer you anything.
 "Q. Did you express to your clients the attitude of the City? A. Yes."
 The Commissioner argues on appeal that the Tax Court's finding that the trustee did not even know of the suit's status should be upheld because the taxpayers neglected to prove that McAllister or Riso actually consulted Foreman about settlement prospects during the precise 12-month liquidation period at all; but this would be a singularly contorted reading of the attorney's testimony.
 
 
 [7]
 The Commissioner contends that this report left some $45,000 of Tidewater's equity unallocated, even though it expressly noted that tax claims by federal, state, and local authorities were possible and McAllister testified that he concluded such claims were likely to exhaust the full sum. In fact, federal authorities alone did assert a claim to a $30,000 portion of this amount, plus interest. In view of the number of agencies and years involved, as well as the size of the corporation in relation to the sum thus set aside, it would be unreasonable to require the trustee to subdivide the $45,000 figure into discrete piles for each tax collector in order to comply with the regulation
 
 
 [8]
 On this appeal the Commissioner has not challenged the amounts Tidewater set aside for its contingent non-tax claims. The Tax Court declined to consider these facts and made no findings concerning them
 
 
 [9]
 After these events, the Commissioner promulgated Rev.Rule 63-245, 1963-2 Cum.Bull. 144, and Rev.Rul. 65-257, 1965-2 Cum.Bull. 89, which provide that a liquidating corporation may satisfy the distribution requirement of § 337(a) by transferring assets to a trustee or in escrow within the 12-month period